**AMMEND, et al., Plaintiffs,**

v.

**BIOPORT, INC., et al., Defendants.**

No. 5:03–CV–031.

United States District Court,
W.D. Michigan,
Southern Division.

March 31, 2004.

Alan C. Milstein, Derek T. Braslow, Sherman, Silverstein, Kohl, Rose & Podolsky, Pennsauken, NJ, for Plaintiffs.

Gerald Zingone, Thelen, Reid & Priest LLP, Washington, DC, J. Terrance Dillon, Myers, Nelson, Dillon & Shierk, PLLC, Grand Rapids, MI, for Defendant.

## OPINION

QUIST, District Judge.

## Table of Contents

I. *Background* ...................................................... 852

II. *Standard of Review* ............................................. 853

III. *Discussion* ..................................................... 854
 A. Defendants Michigan Department of Public Health and Michigan Biologic Products Institute: Eleventh Amendment Sovereign Immunity ................................................. 855
 (1) Source of Funds to Pay Judgment Against MDPH–MBPI ............. 856
 (2) Nature of MDPH–MBPI Under State Law ........................... 857
 (3) Degree of State Control Over MDPH–MBPI ........................ 858
 (4) Performance of Government Functions ............................ 860
 (5) Source of Funding; Destination of Revenues ...................... 861
 B. Defendant Dr. Myers ........................................ 862
 (1) Official Capacity—Eleventh Amendment Sovereign Immunity ........ 862
 (2) Individual Capacity ........................................... 863
 (a) Federal Law Claims ..................................... 863
 (b) State Law Claims ....................................... 863
 C. Defendant BioPort—Successor Liability; Supplemental Testing .......... 864
 (1) Successor Liability—Continuity of Enterprise Theory .............. 865
 (a) Second Turner Prong ................................... 866
 (b) Fourth Turner Prong ................................... 868
 (2) Assumption and Retention of Liabilities—Asset Purchase Agreement ............................................... 868
 (3) Supplemental Testing Program ................................. 870
 D. Other Claims ............................................... 870
 (1) Federal Law Claims .......................................... 870
 (a) Bodily Integrity ....................................... 870
 (b) Human Dignity ........................................ 872
 (2) Fraud Claims ............................................... 873
 E. Other Defenses ............................................. 873

852

 (1) **BioPort—Inheriting the State's Sovereign Immunity** .................873
 (2) **Michigan Drug Manufacturers Products Liability Immunity**
 **Statute** ................................................873
 (a) **Choice of Law** ......................................874
 (b) **Application of Statute** .............................876
 (3) **Feres Doctrine** ......................................877
 (4) **Government Contractor Defense** .......................877
 (a) **Prong 1: Government Approval of Reasonably Precise**
 **Specifications** ..................................877
 (b) **Prong 2: Product's Conformity to Government Specifications** .....878
 (c) **Prong 3: Contractor Warning Government About Known**
 **Dangers** ........................................879

**IV.** *Conclusion* ...................................................879

Plaintiffs in this matter are current or former military members, government contract employees, and spouses who allege harms caused by anthrax vaccine administered under the Department of Defense ("DOD") immunization program. Defendants are the Michigan Department of Public Health ("MDPH"), the Michigan Biologic Products Institute ("MBPI") (together, "MDPH–MBPI"), BioPort, Inc. ("BioPort"), and Dr. Robert C. Myers ("Dr. Myers"). Each Defendant was associated with manufacturing anthrax vaccine. Plaintiffs set forth claims of negligence, breach of warranties, breach of the right to be treated with essential human dignity, strict products liability, fraud, deprivation of civil rights pursuant to 42 U.S.C. § 1983, and loss of consortium. Now before the Court are Defendants' motions to dismiss. For the reasons stated below, the Court will dismiss all claims against MDPH–MBPI, grant in part and deny in part BioPort's motion to dismiss, and grant in part and deny in part Dr. Myers' motion to dismiss.

## I. *Background*

This matter consists of three consolidated cases, each brought by different groups of Plaintiffs but asserting similar claims against the same Defendants. *Allaire, et al. v. BioPort, et al.* ("*Allaire*") originally filed in the United States District Court for the District of Columbia. Judge Kollar–Kotelly granted Defendants' motion to transfer *Allaire* to this District due to insufficient contacts to establish personal jurisdiction under the District of Columbia's long-arm statute. *Fleming, et al. v. BioPort, et al.* ("*Fleming*") was originally filed in the United States District Court for the Western District of Louisiana. Judge James granted Defendants' motion to transfer *Fleming* to this District for lack of personal jurisdiction over all Defendants. *Allaire* and *Fleming* have been combined with this case, *Ammend, et al. v. BioPort, et al.*, which was originally filed in this District.

Anthrax is a lethal disease caused by bacteria that can be delivered by biological weapon systems. In 1965, researchers at the U.S. Army Biological Laboratories in Fort Detrick, Maryland designed and patented the process for producing a vaccine known as Anthrax Vaccine Adsorbed ("AVA") (hereafter referred to as "anthrax vaccine" or "vaccine"). In 1970, the federal government issued a license to manufacture anthrax vaccine to MDPH. Since that time, MDPH and its successors were the only licensed anthrax vaccine producers in the U.S. Beginning in 1988, the Department of Defense ("DOD") awarded MDPH a series of contracts for the production and sale of anthrax vaccine.

The DOD began considering a mass anthrax vaccination program in the early

1990s. In 1997, the DOD announced plans to vaccinate U.S. military personnel under the Anthrax Vaccine Immunization Program ("AVIP") in order to protect the force from biological attacks. The program required that all military personnel would receive a six-shot series of anthrax vaccine. Inoculations were mandatory, and any servicemember who refused the shots was disciplined.

Dr. Myers first became an employee of MDPH in 1978. In 1990, he became Chief of the Biologics Division of MDPH. The Biologic Products Division of MDPH was transferred to MBPI in 1996, at which time Dr. Myers became MBPI's Director. In 1998, the U.S. Food and Drug Administration ("FDA") inspected and shut down MBPI's production facility after finding problems in the anthrax vaccine manufacturing, production, storage, and testing processes. On July 8, 1998, BioPort entered into an agreement with the State of Michigan for the purchase of substantially all of MBPI's assets. The transaction closed on September 4, 1998. A novation agreement transferred MBPI's anthrax vaccine production contract with the federal government to BioPort, and BioPort later was awarded additional contracts. Dr. Myers began working for BioPort following the asset sale. Anthrax vaccine at BioPort later underwent supplemental testing and the production line eventually reopened.

The primary Plaintiffs in this case received mandatory anthrax inoculations while on military duty. They or their representatives claim that the vaccine caused physical ailments and in some cases death. Alleged symptoms include nausea, fatigue, joint pain, memory loss, cognitive impairment, abdominal pain, migraines, seizures, tremors, insomnia, shooting pains, difficulty hearing, earaches, poor balance, vision problems, diges-

tive problems, numbness, and hypersensitivity to smells, chemicals, and light. Plaintiffs argue that the anthrax vaccine with which they were injected was an unreasonably dangerous, defective, and experimental drug. They contend that Defendants produced and manufactured the vaccine in violation of numerous federal regulations and standards, and also misrepresented and withheld information about the vaccine's risks. Based on these allegations, the Complaint sets forth the aforementioned series of claims against the various Defendants and seeks damages.

## II. *Standard of Review*

An action may be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(6). The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions of legal conclusions. *Allard v. Weitzman (In re DeLorean Motor Co.),* 991 F.2d 1236, 1240 (6th Cir.1993) (citing *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988)). All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party. 2 *Moore's Federal Practice,* § 12.34[1][b] (Matthew Bender 3d ed.2003). The Court need not, however, accept unwarranted factual inferences. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–

46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).[1]

### III. *Discussion*

BioPort, MDPH–MBPI, and Dr. Myers have each filed separate motions to dismiss. BioPort's motion sets forth the following arguments: (1) Plaintiffs' claims are barred by the *Feres* doctrine; (2) Plaintiffs' claims are barred by the government contractor defense; (3) Plaintiffs' claims are barred by Michigan's drug product liability immunity statute; and (4) Plaintiffs fail to state a claim for fraud. BioPort also argues that it incurs no successor liability from MDPH–MBPI. MDPH–MBPI base their motion to dismiss on the following arguments: (1) they were state agencies entitled to sovereign immunity under the Eleventh Amendment; (2) the Court lacks diversity jurisdiction over MDPH–MBPI because as state agencies they are not citizens for diversity purposes; (3) the Court lacks federal question jurisdiction over MDPH–MBPI because there is no valid federal claim as to them; and (4) the Court lacks pendent jurisdiction over Plaintiffs' state law claims against MDPH–MBPI. Dr. Myers adopts and incorporates the arguments offered by BioPort and MDPH–MBPI and also asserts the following additional grounds for dismissal: (1) no cognizable cause of action exists against Dr. Myers for actions in his official capacity as an agent of a state sovereign; and (2) Plaintiffs fail to plead a viable claim against Dr. Myers for personal liability in his individual capacity.

Part A of the discussion that follows concludes that all claims against MDPH–

MBPI must be dismissed because these Defendants were state agencies and as such are entitled to sovereign immunity under the Eleventh Amendment. Part B addresses the claims against Dr. Myers, concluding that the official capacity and federal law individual capacity claims against him must be dismissed, but that the state law individual capacity claims survive. Part C examines whether BioPort incurs potential liability as a successor to MDPH–MBPI and finds that although successor liability does not attach under the rule announced in *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), a fact issue remains regarding whether BioPort may have assumed successor liability pursuant to the agreement by which it purchased MDPH–MBPI's assets. Part C also concludes that whether BioPort may have incurred potential liability by conducting supplemental testing of the vaccine remains a disputed issue. Part D addresses various other claims, concluding that Plaintiffs' federal law claims for violations of the right to human dignity and bodily integrity must be dismissed for failure to state a claim and that Plaintiffs have conceded their fraud claims. Finally, Part E turns to other defenses and finds that: BioPort does not inherit MDPH–MBPI's sovereign immunity; the applicability of Michigan's drug product manufacturers liability immunity statute has not been conclusively established; the *Feres* doctrine does not provide a defense in this case; and the requirements of the government contrac-

---

**1.** In their briefs, the parties have discussed and attached materials beyond those attached to or referenced in the pleadings. To the extent that this Opinion considers matters outside the pleadings, the Court treats Defendants' motions as ones for summary judgment and disposes of them as provided in Fed. R.Civ.P. 56, which permits courts to render

judgment if the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The parties have had extensive opportunities to address each other's respective submissions and arguments. *See* Fed.R.Civ.P. 12(b).

tor defense have not been conclusively established.

## A. Defendants Michigan Department of Public Health and Michigan Biologic Products Institute: Eleventh Amendment Sovereign Immunity

Defendants MDPH–MBPI argue that they were state government entities and therefore are immune from suit pursuant to the Eleventh Amendment. Plaintiffs counter that state sovereign immunity does not apply to these defendants because they were not acting as arms of the state and were not performing government functions when manufacturing and selling anthrax vaccine. Instead, Plaintiffs contend, MDPH–MBPI acted as autonomous, for-profit, private enterprises to which the Eleventh Amendment renders no protection. The Court finds that MDPH–MBPI were arms of the State of Michigan and as such enjoy sovereign immunity. Therefore, the claims against MDPH–MBPI will be dismissed.

The Eleventh Amendment to the United States Constitution embodies the concept of state sovereign immunity, stating: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Supreme Court interpretations of the Eleventh Amendment clarify that it bars individuals from suing states in federal court unless the state consents to be sued or Congress overrides such immunity. See Hans v. Louisiana, 134 U.S. 1, 15–18, 10 S.Ct. 504, 507–508, 33 L.Ed. 842 (1890) (Eleventh Amendment bars suits against a state by its own citizens); Edelman v. Jordan, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974) (Eleventh Amendment bars suits against a state by citizens of another state); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984) (sovereign immunity bars suits against state on both federal and state law grounds); Edelman, 415 U.S. at 673, 94 S.Ct. at 1360–61 (states may waive sovereign immunity by unequivocally expressing an intent to do so); Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 59, 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996) (Congress may abrogate Eleventh Amendment immunity with unmistakably clear language in a statute passed pursuant to Section 5 of the Fourteenth Amendment). Plaintiffs in this case, who are individual citizens of Michigan and other states, make no argument that Michigan has waived sovereign immunity or that Congress has abrogated it.[2]

State sovereign immunity under the Eleventh Amendment extends to suits brought against state departments and agencies. "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." Pennhurst, 465 U.S. at 100, 104 S.Ct. at 908. See also Fla. Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 684, 102 S.Ct. 3304, 3314, 73 L.Ed.2d 1057 (1982) ("A suit generally may not be maintained directly against the State itself, or against an agency or department of the State, unless the State has waived its sovereign immunity.").

---

**2.** In addition to the exceptions to sovereign immunity based on state waiver and congressional abrogation, a third exception exists for actions against state officers sued in their individual capacities for injunctive and declaratory relief. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The action against MDPH–MBPI does not implicate the Ex parte Young doctrine.

The question, then, is whether MDPH–MBPI were departments or agencies of the state government. If they were, they cannot be sued and Plaintiffs' claims against them must be dismissed. *See Fed. Mar. Comm'n v. S.C. State Ports Auth.,* 535 U.S. 743, 766, 122 S.Ct. 1864, 1877, 152 L.Ed.2d 962 (2002) ("Sovereign immunity does not merely constitute a defense to monetary liability or even all types of liability. Rather, it provides an immunity from suit.").

■■■■ An entity enjoys state sovereign immunity under the Eleventh Amendment if it is deemed an "arm of the state" government. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). The Supreme Court has not formulated a precise rule to determine whether an entity is an "arm of the state." Instead, the determination is made on a case-by-case basis, with various courts taking into account factors such as: (1) whether state funds would be used to pay a judgment against the entity; (2) the nature of the entity as created by state law; (3) whether the state intended to confer Eleventh Amendment immunity on the entity; (4) whether the entity exercises the state power and is under state control; (5) whether the entity performs functions typically performed by a state government; (6) whether the entity has the right to sue in its own name; and (7) whether the entity has the power to hold property in its own name. 17A Moore's Federal Practice, § 123.23[4][b][i] (Matthew Bender 3d ed.2003).

■■■■ While most circuits have enunciated their own multi-factor tests for the "arm of the state" analysis, the Sixth Circuit has not. However, the Sixth Circuit discussed with approval other circuits' tests in *Brotherton v. Cleveland,* 173 F.3d 552 (6th Cir.1999):

Most of our sister circuits undertake a multi-factor analysis to decide whether an entity is an arm of the state. *See, e.g., Duke v. Grady Mun. Schs.,* 127 F.3d 972, 974 & n. 4 (10th Cir.1997) (compiling cases and tests from the Second, Third, Fourth, Eighth, and Tenth Circuits.) The Eleventh Circuit's test is illustrative; in *Hufford v. Rodgers,* 912 F.2d 1338 (11th Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991), it listed four factors relevant to its inquiry: "how state law defines the entity, what degree of control the state maintains over the entity, where funds for the entity are derived, and who is responsible for judgment against the entity." *Id.* at 1341 (quoting *Tuveson v. Florida Governor's Council on Indian Affairs, Inc.,* 734 F.2d 730, 732 (11th Cir.1984)). The Tenth Circuit provides a helpful overview by categorizing its factors as broadly reflecting "the degree of autonomy of the particular entity . . . and the source from which the entity receives its funds, and in particular, whether a money judgment against the entity would be satisfied out of the state treasury." *Duke,* 127 F.3d at 974 n. 3.

*Id.* at 560. In the explanation that follows, the Court applies the aforementioned factors and other indicia to explain its rationale for concluding that MDPH–MBPI were "arms of the state."

**(1) Source of Funds to Pay Judgment Against MDPH–MBPI**

The most important factor in the "arm of the state" analysis is whether state funds would be used to pay any judgment resulting from a suit against the entity. *See Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 430, 117 S.Ct. 900, 904, 137 L.Ed.2d 55 (1997); *Alkire v. Irving,* 330 F.3d 802, 811 (6th Cir.2003). Indeed, protecting the solvency of state treasuries is

one of the Eleventh Amendment's primary goals, the other being to preserve the dignity and autonomy of state governments. *See Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 47, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994). Plaintiffs point to agreements whereby either BioPort or the federal government has promised to indemnify MDPH–MBPI for any money judgments. Because of these indemnification agreements, Plaintiffs contend, the state's purse risks no danger of being depleted. MDPH–MBPI counter that the agreements provide only "possible indemnification," and that in any event, the State of Michigan may have to enforce the indemnity agreements in federal court, thus subjecting the state twice to suit in federal court.

The dispute over indemnity misses the point. Whether or not BioPort or the federal government will indemnify MDPH–MBPI in the event of an adverse judgment is irrelevant to the "arm of the state" analysis. What matters is the state's potential for *legal* liability. A state may be legally liable even though in actually it will not pay due to reimbursement or indemnification from a third party. *See Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 431, 117 S.Ct. 900, 904, 137 L.Ed.2d 55 (1997) (state's potential legal liability rather than actual liability determinative; fact that Department of Energy would pay damage award does not affect Eleventh Amendment analysis; an agreement by the federal government to indemnify a state instrumentality against an adverse judgment does not divest a state agency of Eleventh Amendment immunity); *Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1311–13 (11th Cir.2000) (provisions indemnifying state are irrelevant to determination of whether entity is entitled to state immunity). Thus, the real question is whether the state treasury would have to pay if the indemnification provisions were inoperative. Because the answer to that question in this case is yes, the source of payment factor favors a conclusion that MDPH–MBPI were "arms of the state."

### (2) Nature of MDPH–MBPI Under State Law

Another factor in the "arm of the state" analysis requires examining the nature of the entity under state law. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). The following discussion reviews the legal context in which MDPH–MBPI came into being, evolved, and operated. It shows that state law treated MDPH–MBPI as state government entities up to the time of the asset sale to BioPort. Accordingly, this factor suggests that they were "arms of the state."

The constitution of the State of Michigan divides the state government into the Executive, Legislative, and Judicial branches. Mich. Const. art. III, § 2. The Executive branch consists of principal departments. Mich. Const. art. V, § 2. Michigan law defines these departments, as well as other state-affiliated organizations, to be part of the State of Michigan. See M.C.L. § 691.1401(c) (defining "state" to mean "the state of Michigan and its agencies, departments, commissions, courts, boards, councils, and statutorily created task forces and includes every public university and college of the state, whether established as a constitutional corporation or otherwise"). The Michigan Department of Public Health (MDPH) was one of the principal departments designated by the Executive Reorganization Act of 1965, M.C.L. § 16.104. A state statute authorized the MDPH to "develop and produce pharmaceutical, biologic, and diagnostic products and by-products for human,

veterinary, or agricultural use for distribution or sale outside this state for both public and private use . . . ." M.C.L. § 333.9111(2).

A 1978 statute established the Michigan Biologic Products Division within the MDPH. The Michigan Constitution authorizes the establishment of temporary commissions or agencies for special purposes with a life of no more than two years and provides that such temporary commissions or agencies need not be allocated within a principal department. Mich. Const. art. V, § 4. Pursuant to this constitutional provision, the Michigan Biologic Products Division of MDPH was transferred in its entirety out of the MDPH and renamed the Michigan Biologic Products Institute (MBPI) in 1996 by Executive Reorganization Order (E.R.O.) No.1995–20, M.C.L. § 333.26323. The E.R.O. established MBPI as a "temporary agency," and also established the Michigan Biologic Products Commission as a "temporary agency" to supervise MBPI. M.C.L. § 333.26323(I)(A). The E.R.O. mandated that both MBPI and the Michigan Biologic Products Commission have a life of no more than two years. M.C.L. § 333.26323(I)(B), (C). MBPI was to be independent and autonomous of other state departments or agencies: "The Institute shall be an independent and autonomous entity with the intent that its authority, powers, duties and responsibilities and the authority, powers, duties, and responsibilities of the Director, including personnel, budgeting, procurement and management-related functions, be exercised free from the direction and supervision of the principal departments in the Executive Branch." M.C.L. § 333.26323(I)(B)(2). MBPI employees were designated public servants working at a public entity, subject to applicable Civil Service Commission rules and ·regulations. M.C.L. § 333.26323(IV). MBPI was permitted to

transact with "other state departments or individuals" for services such as personnel, security, and maintenance. M.C.L. § 333.26323(V). The Governor appointed the members of the Commission tasked with overseeing MBPI, and their meetings were subject to the state Open Meetings Act. M.C.L. § 333.26323(I)(C). The Commission was ordered to come up with a plan describing the means by which MBPI would be "transferred out of state government and into the private sector" within two years. M.C.L. 333.26323(II)(1).

In 1997, the Michigan Biologic Institute Transfer Act, M.C.L. § 333.26331, et seq., transferred MBPI out of the MDPH and established it as an independent, autonomous entity within the Michigan Department of Community Health (MDCH). M.C.L. § 333.26333a. As a rationale for this move, the legislature expressed its determination that increased costs "adversely affected the ability of the state to sustain [MBPI as] a viable, self-supporting operation." M.C.L. § 333.26332(a). MBPI's transfer to MDCH served the purpose of preparing MBPI either "to be conveyed to a private enterprise" or to be "discontinued." M.C.L. 333.26332(b), (c). In 1998, MBPI was dissolved and its assets were sold to a private company, BioPort.

### (3) Degree of State Control Over MDPH–MBPI

An entity's degree of autonomy from or, alternatively, control by, the state comprises another factor in the "arm of the state" analysis. An entity is more likely to be acting as an arm of the state if the state government appoints its executives and directs, guides, regulates, or vetoes its activities. *See, e.g., Hess v. Port Auth. Trans– Hudson Corp.,* 513 U.S. 30, 47, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994). Conversely, an entity is more likely to be autonomous of the state if it has the right

to sue and be sued in its own right. *See Callahan v. City of Philadelphia,* 207 F.3d 668, 670 (3d Cir.2000). An entity's ability to hold property in its own name also suggests autonomy. *See Skelton v. Camp,* 234 F.3d 292, 297 (5th Cir.2000). The Court determines that MDPH–MBPI's connection to and control by the state government supports a conclusion that they were "arms of the state."

As the preceding discussion of MDPH–MBPI's status under state law shows, state law accorded the Michigan government extensive control over these organizations. MDPH existed as a principal department of the executive branch. When MBPI later came into being, the state governor appointed its administrator and oversight commission. M.C.L. § 333.26323(I), 333.26333b. The nature of the state's control over MDPH–MBPI differed from state control over organizations such as municipalities and multi-state bodies created by interstate compacts, which may receive no Eleventh Amendment immunity even though they are subject to some state control. *See, e.g., Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 47, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994) (multi-state organization); *Lake Country Estates, Inc., v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979) (multi-state agency); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977) (local school board). In contrast to the entities considered in these cases, no external authority other than the State of Michigan exerted control over MDPH–MBPI. These cases and others suggest that the autonomy inquiry largely turns on comparing the state's control to another governing body's, such as a municipality or another state. In this case, however, there is no such competing controlling entity.

Under an umbrella of government oversight, MDPH–MBPI exercised some degree of operational autonomy. For example, the entities apparently controlled their manufacturing operations and had the power to make and execute contracts, acquire property, and sue and be sued in their own names. These independent powers weigh against deeming MDPH–MBPI arms of the state, but not strongly. Other indicia show that despite having a degree of independent identity, MDPH–MBPI were state agencies.[3] For example, the agreement whereby BioPort acquired MBPI's assets is captioned as follows: "ASSET PURCHASE AGREEMENT between *STATE OF MICHIGAN,* Seller and BIOPORT CORPORATION, a Michigan corporation, Purchaser." (*Ammend Compl.* Ex. H.) (italics added). The fact that the Attorney General of the State of Michigan represents MDPH–MBPI in this matter further manifests these entities' close ties to the state. *Cf. Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n,* 822 F.2d 456, 458–59 (4th Cir. 1987) (entity found not to be an arm of the state where it was not represented by the state attorney general, as state law required of state agencies). The real party of interest behind MDPH–MBPI is the State of Michigan.

---

3. Plaintiffs' Complaint in several instances indicates an understanding that MDPH–MBPI were state agencies. Paragraph 85 states: "In 1970, the United States Public Health Service issued the AVA license to the *state-owned facility* operated by the MDPH for protection against cutaneous anthrax only." (emphasis added) Paragraph 101 states: "In 1995, MBPI was created by Executive Order of the Governor of the State of Michigan in order to make the move from *state owned and operated* to private ownership." (emphasis added)

### (4) Performance of Government Functions

Another factor in the "arm of the state" analysis addresses whether the entity performs functions typically conducted by a state government. Plaintiffs argue that MDPH–MBPI were not performing state government functions when manufacturing and selling anthrax vaccine, but instead engaged in a for-profit commercial enterprise. In support of this view, Plaintiffs state that MDPH–MBPI sold vaccine to various corporations, non-profit organizations, and government agencies. Additionally, MDPH–MBPI allegedly asked for indemnification against product liability lawsuits stemming from the anthrax vaccine and paid for product liability insurance. Plaintiffs further contend that the State of Michigan admitted that MBPI did not fulfill a state government function when it announced plans to sell MBPI's assets to a private firm. Finally, Plaintiffs argue that the vaccine MDPH–MBPI manufactured was not intended for State of Michigan citizens unless they coincidentally happened to be in the military. The Court concludes that although state governments typically do not make and sell anthrax vaccine, MDPH–MBPI did perform a government function in light of the circumstances in which they operated.

Several cases have considered the question of what constitutes a government function. Two of these cases involved entities which, in light of the other "arm of the state" factors, would probably have been deemed business enterprises separate from the state, but which performed roles so essential that they were given "arm of the state" status. First, in *Alaska Cargo Transport, Inc. v. Alaska Railroad Corp.*, 5 F.3d 378 (9th Cir.1993), the court decided that the Alaska Railroad Corporation was an arm of the state. Even though a state statute provided that the corporation, and not the state, would be liable for any judgments against the Corporation, the Court determined that the Alaska Railroad Corporation performed a vital, essential state function by operating a critical, statewide transportation, supply, and communication network. *Id.* at 380–83. Second, in *Shands Teaching Hospital & Clinics, Inc. v. Beech Street Corp.*, 208 F.3d 1308 (11th Cir.2000), the court listed numerous cases extending Eleventh Amendment protection to private corporations acting as fiscal intermediaries in actions relating to Medicare reimbursement. "[A]lthough these are private corporations that are neither controlled nor funded by the state, they are protected by governmental immunity when they are clearly acting as agents of the state . . . . immunity has been granted only to the extent that a judgment would expose the government to financial liability or interfere with the administration of government programs." *Id.* at 1311. "Thus the question in this case is whether and to what extent these corporations are contractually acting as representatives of the State." *Id.* In contrast, *Teichgraeber v. Memorial Union Corp. of the Emporia State University*, 946 F.Supp. 900 (D.Kan. 1996) decided that a non-profit student union on a state university lacked Eleventh Amendment immunity, in part because it failed to prove that it performed an "essential and traditional" government function. *Id.* at 905.

Application of these cases would seem to point to a conclusion that MDPH–MBPI did not perform a government function. Over time, MDPH–MBPI's functions resembled less those of a state government and more those of a private concern. In addition, production of anthrax vaccine cannot plausibly be characterized as essential to the state. Indeed, the State of Michigan recognized this to be the case when it mandated the sale of MBPI's assets out of state government to a private

firm. A report on the MBPI "FY 97 Executive Budget" posted on a state web site states:

> The change in the market for pediatric vaccines and the growth of the division's relationships with outside customers made it clear that the division *no longer fulfilled a state government function* and that the new institute could become a self sustaining enterprise. In keeping with the vision of this institute as a self-sustaining enterprise, the Governor's fiscal year 1997 recommendation reflects a budget which is totally supported by outside revenues and totals $16.3 million, thereby eliminating all general fund support.

(*Ammend* Compl. Ex. J.) (emphasis added) Plaintiffs claim that this statement constitutes the State of Michigan's admission that MBPI did not perform a government function and thus should not be considered an "arm of the state."

However, up to the time of the BioPort purchase, the production and sale of anthrax vaccine constituted, at least formally, a state government function, albeit an atypical one. The web site excerpt above shows that vaccine production was not a government function in the sense of meeting an essential state-wide need, but the activity nevertheless comports with the meaning of a government function under Michigan law. A state statute defines "governmental function" as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." M.C.L. § 691.1401(f). Furthermore, the Michigan Supreme Court has defined the term "governmental function" to mean "an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law." *Ross v. Consumers Power Co.*, 420 Mich. 567, 620, 363 N.W.2d 641, 661 (1984). A state statute expressly authorized MDPH to develop, produce, and distribute anthrax vaccine: "The de-partment [MDPH] may develop and produce pharmaceutical, biologic, and diagnostic products ... for distribution or sale outside this state for both public and private use." M.C.L. § 333.9111(2). This authorized function of the Biologic Products Division of MDPH was transferred to MBPI in 1996. Later, MBPI, along with its statutory functions, was transferred to MDCH in 1997. In light of the aforementioned definitions and statutory authorizations, there can be no question that MDPH–MBPI performed a government function in manufacturing and selling anthrax vaccine.

### (5) Source of Funding; Destination of Revenues

An entity's source of funding is another relevant factor in the determination of whether it is an "arm of the state." The more an entity's funding comes from the state, the more likely it will be deemed a state government entity with Eleventh Amendment immunity. *See, e.g., Anderson v. Red River Waterway Comm'n*, 231 F.3d 211, 214 (5th Cir.2000). However, the case law makes clear that an entity's source of operational funding is less important than the source of payment for a judgment against the entity. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430, 117 S.Ct. 900, 904, 137 L.Ed.2d 55 (1997); *Brotherton v. Cleveland*, 173 F.3d 552, 561 (6th Cir.1999). In this case, it appears that MDPH–MBPI generated at least a significant portion if not all of their of their funding on their own by selling vaccine, requiring them to draw little if anything out of the state budget. However, MDPH–MBPI received no funding from other sources. It also appears that revenues from vaccine sales in excess of MDPH–MBPI's costs went to the state treasury. On balance, this factor favors deeming MDPH–MBPI to be "arms of the state."

Court decisions illustrate the application of this factor. *See, e.g., Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401–402, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979) (mentioning that a regional planning agency found not to be immune was funded by counties, not states); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 573, 50 L.Ed.2d 471 (1977) (finding that a local school district was not an arm of the state, in part because although it received a significant amount of state money, it also had its own extensive taxing and borrowing powers); *Brotherton v. Cleveland,* 173 F.3d 552, 561 (6th Cir.1999) (determining that a nonprofit eye bank was not an arm of the state, in part because it was unlikely that the state had "any financial involvement" with the entity, as state laws did "little more" than give the eye bank "permission to harvest corneas").

Plaintiffs allege that at least in the years leading up to the sale to BioPort, MDPH–MBPI were self-sustaining enterprises with budgets totally supported by outside revenues and receiving no general fund support from the state. Plaintiffs state that MDPH–MBPI's customers included SmithKline Beecham, North American Biologics, the American Red Cross, and the United States military. MDPH–MBPI offer little in response. In fact, the budget appropriation act for the fiscal year ending September 30, 1998, allocated no state funds to MBPI and acknowledged that MBPI would receive $15,000,000 in "biologic product sales and other revenues." M.C.L. § 333.26336c. It appears, though, that MDPH–MBPI's revenues in excess of costs went to the Michigan state government. The statute authorizing the MDPH also created the Pharmaceutical Products Fund (PPF), a fund administered by the MDPH but located "in the state treasury." M.C.L. § 333.9112(1). "[A]ll revenues received" by the MDPH were placed in the

PPF. M.C.L. § 333.9112(2). The PPF was used "to update and improve the facilities used to develop and produce pharmaceutical, biologic, and diagnostic products … or to otherwise improve the biologics products program." M.C.L. § 333.9112(3). The 1996 transfer of the Biologic Products Division of MDPH to MBPI included the transfer of the administration of the PPF, but the fund remained within the state treasury. M.C.L. § 333.26323(I)(B)(4). These facts indicate that MDPH–MBPI's financial connections to the State of Michigan were sufficiently strong to warrant deeming them "arms of the state."

## B. Defendant Dr. Myers

Dr. Myers was formerly the Chief of the Biologics Division of MDPH and the Director of MBPI. He currently serves as BioPort's Executive Vice President. Plaintiffs have sued Dr. Myers both in his official capacity based on his positions at MDPH–MBPI and in his individual capacity. For the reasons stated below, the Court will dismiss the official capacity and federal law individual capacity claims against Dr. Myers but permit the state law individual capacity claims to go forward.

### (1) Official Capacity—Eleventh Amendment Sovereign Immunity

■ The claims against Dr. Myers in his official capacity must be dismissed because the Eleventh Amendment immunizes him from suit in his official status. Lawsuits against state officials in their official capacity are deemed to be lawsuits against the state itself. *Will v. Mich. Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). The Court has already determined that MDPH–MBPI were state government entities. A state agency official such as Dr. Myers during his tenure at MDPH–MBPI receives the same sovereign immunity as the

state agency itself. *See Wells v. Brown,* 891 F.2d 591, 592 (6th Cir.1989) ("state officials sued in [their] official capacity for damages are absolutely immune from liability under the Eleventh Amendment.").

■ Plaintiffs' effort to avoid sovereign immunity by invoking *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), is unavailing. Under the *Ex parte Young* doctrine, a state official who violates federal law is stripped of his official or representative character; the state cannot cloak the officer in its sovereign immunity under such circumstances. *Id.* at 159–60, 28 S.Ct. at 454. In this case, however, no federal law claims survive. Plaintiffs assert federal claims under § 1983 for violations of purported constitutional rights to bodily integrity and human dignity. The Court addresses these constitutional allegations *infra,* concluding that they fail to state a claim upon which relief can be granted and thus must be dismissed on their merits. With the federal claims thus dismissed, *Ex parte Young* becomes irrelevant. Dr. Myers remains immune from all claims brought against him in his official capacity.

### (2) Individual Capacity

### (a) Federal Law Claims

■■ Dr. Myers argues that the federal doctrine of qualified immunity warrants dismissal of the § 1983 constitutional claims brought against him in his individual capacity. Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual

constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation. *Klein v. Long,* 275 F.3d 544, 550 (6th Cir.2001). As the Court discusses *infra,* the Complaint fails to adequately state federal constitutional claims in the first place, requiring dismissal of those claims. It is therefore unnecessary to determine whether Dr. Myers has qualified immunity to those claims.

### (b) State Law Claims

Dr. Myers argues that insofar as the Complaint can be construed to assert state law claims against him in his individual capacity, these claims should be dismissed as well. Dr. Myers first contends that the Complaint is devoid of allegations which, even if true, could serve as a basis for personal liability. The Court disagrees. The Complaint includes several state law claims against Dr. Myers, including negligence, breach of warranties, and fraud. Whether or not Plaintiffs will be able to prove these claims remains to be seen, but the Court is not prepared to dismiss them on the merits at this stage.

Next, Dr. Myers argues that even if Plaintiffs' state law claims are viable, Michigan law provides him absolute immunity from personal liability for actions while he worked at MDPH–MBPI. In Michigan, certain of the state's "highest executive officials" are absolutely immune from personal liability for claims arising out of acts or omissions relating to the performance of their jobs. *See Ross v. Consumers Power Co.,* 420 Mich. 567, 633, 363 N.W.2d 641, 667 (1984) ("We therefore hold that judges, legislators, and the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their judicial, legislative, or executive authority."). *Ross* thus requires the

Court to make two determinations: first, whether Dr. Myers was a "highest executive official," and second, whether he was acting within his "executive authority."

■ In order to be considered a "highest executive official," an individual "should have broad-based jurisdiction or extensive authority similar to that of a judge or legislator." *Chivas v. Koehler*, 182 Mich.App. 467, 471, 453 N.W.2d 264, 266 (1990). *Chivas* assessed whether absolute immunity attached to several state prison officials. The Director of the Michigan Department of Corrections (MDOC) qualified for absolute immunity because he was the highest executive in that state governmental department. *Id.* The Deputy Director of the MDOC in charge of the Bureau of Correctional Facilities (BCF) also received absolute immunity. He was responsible for approving the transfer of inmates out of the Michigan Intensive Program Center (MIPC), and no one else reviewed his approval decisions. Because he, too, "exercised broad-based jurisdiction and extensive authority as the administrator" of the BCF, the court deemed him "one of the 'highest executive officials' in his department of state government." *Id.* However, lower-level officials such as the superintendent of the MIPC (a single facility) and prison wardens lacked the broad jurisdiction to entitle them to absolute immunity. *Id.*

■ In this case, Dr. Myers first became an employee of MDPH in 1978. In 1990, he became Chief of the MDPH's Biologics Division, occupying the top position in the Division and reporting to the Chief of the Bureau of Laboratory and Epidemiological Services of the MDPH. Dr. Myers filled MBPI's highest position as Director of that entity from the time of its inception in 1996 until the sale of its assets to BioPort in 1998. Based on these positions, Dr. Myers asserts that he was among the "highest executive officials" of

both MDPH and MBPI. However, Dr. Myers has not provided sufficient information regarding the scope of his jurisdiction and authority in these positions, especially with respect to his role as Chief of the MDPH Biologics Division. Moreover, he has provided no information relevant to the second inquiry under *Ross*, namely, whether he was acting within his "executive authority" in undertaking the conduct of which Plaintiffs complain. Accordingly, the Court cannot rule as a matter of law that Dr. Myers enjoys absolute immunity from Plaintiffs' state law claims.

## C. Defendant BioPort—Successor Liability; Supplemental Testing

■ As a general rule, a corporation that purchases the assets of another corporation does not, simply by virtue of the asset purchase transaction, become liable for the obligations of the seller. *City Mgmt. Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244, 251 (6th Cir.1994). However, the general rule is subject to four exceptions whereby successor liability may attach: (1) where the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liabilities; (2) where the transaction amounts to a consolidation or merger of the two corporations; (3) where the purchasing corporation is a "mere continuation" of the selling corporation; and (4) where the transaction is entered into fraudulently, in order to escape liability for the obligations of the selling corporation. *Id.* The case at bar implicates the first and third exceptions, as the Asset Purchase Agreement includes a paragraph allocating assumed and retained liabilities for claims brought under products liability theories, and the parties contest whether BioPort shares continuity of enterprise with the seller of the assets it purchased.

The Court addresses the continuity of enterprise issue first, concluding that Bio-Port has no successor liability by way of the continuity of enterprise theory. Next, the Court turns to the contractual allocation of liability issue, concluding that the terms of the Asset Purchase Agreement do not make clear whether the signatory parties intended for BioPort to assume potential liability for at least some lots of anthrax vaccine. And if BioPort has assumed liability, a fact issue remains regarding for which lots. The Court further concludes that whether potential liability attaches to BioPort based on its participation in the anthrax vaccine supplemental testing program remains unresolved. Accordingly, all claims against BioPort which are not dispensed with elsewhere in this Opinion survive the motion to dismiss.

**(1) Successor Liability—Continuity of Enterprise Theory**

In the seminal case of *Turner v. Bituminous Casualty Company*, 397 Mich. 406, 244 N.W.2d 873 (1976), the Michigan Supreme Court adopted the continuity of enterprise theory of successor liability in products liability cases. *Turner* held that despite the traditional rule against successor liability in asset purchase transactions, a corporate successor may be liable for injuries caused by its predecessor's defective products if the totality of the acquisition demonstrates "a basic continuity of the enterprise" between the predecessor and successor corporations. *Id.* at 430, 244 N.W.2d at 883. This theory, the *Turner* court reasoned, better served the policy considerations underlying products liability law. *Id.* at 418–19, 244 N.W.2d at 878. *See also Foster v. Cone–Blanchard Mach. Co.*, 460 Mich. 696, 703, 597 N.W.2d 506, 510 (1999) ("In the context of tort law, the traditional rule with its narrow exceptions has been criticized as an elevation of form over substance, that may leave victims of a defective product without re-

course."); *Pelc v. Bendix Mach. Tool Corp.*, 111 Mich.App. 343, 352, 314 N.W.2d 614, 618 (1981) ("The Turner Court reasoned that the traditional corporate law approach was neither legally nor logically related to the policy considerations underlying the evolving law of products liability."). Continuity of enterprise between a successor and its predecessor may force a successor to "accept the liability with the benefits" of such continuity. *Turner*, 397 Mich. at 430, 244 N.W.2d at 883.

*Turner* held that a prima facie case of continuity of enterprise exists when a plaintiff establishes the following:

(1) there is a basic continuation of the seller corporation's enterprise reflected in a continuity of management, personnel, physical location, assets, and general business operations of the predecessor corporation;

(2) the predecessor corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible;

(3) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the selling corporation.

(4) the purchasing corporation holds itself out to the world as the effective continuation of the seller corporation.

*Turner*, 397 Mich. at 430, 244 N.W.2d at 883–84.

More than two decades after the *Turner* decision, the Michigan Supreme Court described the fourth item on the list above as "an additional principle relevant to determining successor liability." *Foster v. Cone–Blanchard Mach. Co.*, 460 Mich. 696, 703, 597 N.W.2d 506, 510 (1999). *Foster* explained:

This principle has been called the fourth guideline of the *Turner* continuity of enterprise analysis. However, we note that a truer reading of *Turner* suggests that the first three guidelines were intended to complete the continuity of enterprise inquiry where there is a sale of corporate assets. *Turner* went on to identify as a separate and relevant inquiry whether a purchasing corporation holds itself out as the effective continuation of the seller.

*Id.,* 460 Mich. at 704 n. 6, 597 N.W.2d at 510 n. 6.

According to BioPort, Plaintiffs cannot prove either the second or fourth *Turner* prongs. BioPort, in its estimation, need not and therefore does not contest the first and third prongs, which the Court thus understands BioPort to concede. This approach reflects BioPort's erroneous assumption that Plaintiffs must satisfy each *Turner* factor in order to proceed with their case. BioPort is mistaken in positing that the *Turner* factors are independent predicate elements to a finding of successor liability under the continuity of enterprise doctrine such that a failure by Plaintiffs to demonstrate one of the *Turner* guidelines is fatal to a continuity of enterprise claim. Rather, the factors "are to be balanced and weighed ... to determine if the totality of the transaction preponderates in favor of imposing successor liability." *Pelc,* 111 Mich.App. at 354–55, 314 N.W.2d at 619. "[T]hese criteria" are not "ironclad elements, each and every one of which must be present to find successor liability ....[t]hey are only guidelines ....all [are] relevant, with the first as perhaps of greatest significance." *Korzetz v. Amsted Indus., Inc.,* 472 F.Supp. 136, 143 (E.D.Mich.1979), *recognized as overruled on other grounds* by *Johnson v. Ventra Group, Inc.,* 191 F.3d 732, 746 (6th Cir.1999). Accordingly, a proper application of *Turner* assesses whether the "total-ity of the transaction" suggests continuity of enterprise.

### (a) Second Turner Prong

In spite of the overall balancing orientation of the *Turner* analysis, the second *Turner* guideline operates with dispositive force in certain circumstances. Once again, the second guideline favors a finding of continuity of enterprise if the predecessor corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible. "[F]ailure of the predecessor to dissolve may not be fatal in every action for successor liability, especially, for example, where the predecessor continues as a shell or is otherwise underfunded." *Foster,* 460 Mich. at 706, 597 N.W.2d at 511. However, there can be no continuity of enterprise and thus no successor liability if the "predecessor remains a viable source for recourse." *Id.* Stated differently, "the availability of a predecessor is fatal to actions for successor liability." *Id.* at 704 n. 7, 597 N.W.2d at 510 n. 7.

This rule from *Foster* requires the Court first to identify BioPort's predecessor and second to determine whether the predecessor remains available. As for the first inquiry, the Court concludes that BioPort's predecessor was not MBPI, which undeniably ceased to exist after the asset purchase transaction, but rather the State of Michigan, which of course continues in existence. This conclusion comports with the Court's preceding discussion of MDPH–MBPI's immunity from suit under the Eleventh Amendment, in which the Court determined that MDPH–MBPI were state government entities. That the transaction involved the state as predecessor and BioPort as successor is evident in the first sentence of the Asset Purchase Agreement, which states: "This ASSET PURCHASE AGREEMENT ... is made

and entered into by and among the STATE OF MICHIGAN (*"Seller"*) and BIOPORT CORPORATION, a Michigan corporation (*"Purchaser"*)." (*Ammend* Compl. Ex. L.)

Having identified the State of Michigan as BioPort's predecessor, the second inquiry is whether the state can be considered "available" as a "viable source for recourse." *Foster*, 460 Mich. at 706, 597 N.W.2d at 511. This is a more difficult question. Although Michigan was BioPort's predecessor and continues in existence, it is immune from suit by virtue of the Eleventh Amendment. Is the state an available, viable source of recourse if it is immune?

Most cases in the *Turner* and *Foster* line discussing a predecessor's continuing existence and availability are factually inapposite to the instant case. Those cases generally involve private business predecessors and successors, where the predecessor was amenable to suit prior to the asset sale transaction. They hold that a products liability plaintiff may not sue a successor if the predecessor remains capable of being sued. If, however, the transaction deprives the plaintiff of an effective remedy against the predecessor, then the Court should consider imposing liability on the successor. *See, e.g., Foster*, 460 Mich. at 705–706, 597 N.W.2d at 511 (finding no successor liability under *Turner* when predecessor was available to suit, as evidenced by plaintiff's $500,000 settlement with predecessor; successor liability doctrine's rationale is to provide a source of recovery for injured plaintiffs who have "no place to turn for relief except to the second corporation") (quoting *Turner*, 397 Mich. at 419, 244 N.W.2d at 878); *Santa Maria v. Owens–Illinois, Inc.*, 808 F.2d 848, 859 (1st Cir.1986) ("it is crystal clear that under [*Turner*] ... it is absolutely essential for the broader exception to the rule of nonliability in products liability cases to come to

bear that the injured plaintiff must have been deprived *by the asset transaction* of an effective remedy against the predecessor corporation that actively manufactured the product causing the injury") (emphasis in original).

This case is different. Here, the predecessor has always been cloaked with sovereign immunity and has never been amendable to the type of suit Plaintiffs bring, whether now or before the asset sale. The asset sale therefore did not deprive Plaintiffs of an effective remedy against the predecessor; Plaintiffs never had such a remedy in the first place. Thus, this case fails to implicate the policy rationale behind the successor liability doctrine, which *Turner* explained to be the preservation of an injured person's access to relief notwithstanding the occurrence of a corporate transfer between the time the predecessor makes a product and the time a person injured by the product files suit. In discussing the "underlying logic" of its holding, the *Turner* court explained how successor liability prevents changes in corporate forms from victimizing plaintiffs. Without successor liability, an injured person faces "the problem of recovery" when a predecessor "legally and/or practically becomes defunct." 397 Mich. at 419, 244 N.W.2d at 878. The injured person "has no place to turn for relief except to the second corporation." *Id. Turner's* holding solves the problem of recovery, ensuring that plaintiffs do not lose access to a remedy they once had. Moreover, the successor liability doctrine avoids the "unfair and unbelievable" perverse incentive that would arise absent the *Turner* rule whereby businesses would engage in cash-for-asset transactions when "the only real reason is to avoid products liability suits." *Id.* at 422–23, 244 N.W.2d at 880. None of these policy concerns arise in this case.

Indeed, to peg BioPort with successor liability for the actions of its immune predecessor would work an injustice on BioPort and deliver an unfair windfall to Plaintiffs. Rather than losing a remedy that they were once entitled to pursue, Plaintiffs in this case seek to gain a remedy which they never had prior to the asset sale. Such a result would be as unjust as the outcome *Turner* sought to prevent. Shielding BioPort from successor liability under the continuity of enterprise theory leaves Plaintiffs no worse off than they would be had the state never sold MBPI's assets, and that is a fair result.

### (b) Fourth Turner Prong

The fourth prong of the *Turner* inquiry favors a finding of successor liability if the purchasing corporation holds itself out to the world as the effective continuation of the seller corporation. In this case, BioPort never held itself out as a continuation of the State of Michigan or its agencies, MDPH–MBPI. This prong therefore strengthens the Court's conclusion that successor liability should not attach to BioPort.

Estoppel and fairness principles undergird the fourth *Turner* guideline. "Justice would be offended if a corporation which holds itself out as a particular company for the purpose of sales, would not be estopped from denying that it is that company for the purpose of determining products liability." *Turner*, 397 Mich. at 426, 244 N.W.2d at 882. A buyer company "holds itself out" as a continuation of the seller when, for example, it attempts to capture the seller's goodwill by retaining its name or otherwise identifying and representing itself as the seller. *See, e.g., Fenton Area Public Schools v. Sorensen–Gross Constr. Co.*, 124 Mich.App. 631, 644, 335 N.W.2d 221, 226 (1983) (fourth *Turner* guideline established when buyer adopted seller's name in order to take advantage of any good will associated with the name);

*Pelc*, 111 Mich.App. at 354, 314 N.W.2d at 619 (finding satisfaction of the fourth *Turner* guideline when buyer listed itself under seller's name in telephone directory, labeled products with seller's name, and distributed literature to customers representing and identifying itself as a continuation of seller).

There can be no doubt that neither BioPort's customers nor the public nor any other interested party mistook BioPort to be a mere continuation of the state agencies from which it purchased assets. The sale was widely publicized in the press and on the internet both before and after its consummation, making it abundantly clear that BioPort was a new, private enterprise. The federal government, including the DOD and FDA, unquestionably understood BioPort not to be a mere continuation of MBPI. In fact, BioPort, the DOD, and the State of Michigan entered into a novation agreement to allow BioPort to assume the state's government contracts. There could be no confusion regarding the separation between BioPort and the state. Accordingly, Plaintiffs cannot satisfy the fourth *Turner* guideline.

### (2) Assumption and Retention of Liabilities—Asset Purchase Agreement

Another exception to the general rule against successor liability in asset purchase transactions arises when the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liabilities. *City Mgmt. Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244, 251 (6th Cir.1994). The Asset Purchase Agreement contains a provision whereby BioPort contractually agreed to assume certain product liabilities. However, the Court is unable to discern whether the parties to the contract intended BioPort's assumed liabilities to extend to third party recipients of

anthrax vaccinations such as Plaintiffs in this case. In addition, which lots of vaccine are included in any liabilities BioPort may have assumed remains unclear. In light of the outstanding questions of fact regarding whether and to what extent Bio-Port may have incurred successor liability under the Asset Purchase Agreement, the Court will not rule as a matter of law that BioPort escapes successor liability.

The July 8, 1998, Asset Purchase Agreement between the State of Michigan and BioPort includes the following paragraph regarding the allocation of products liabilities:

> 1.5.3. *Product Liability.* The Purchaser and Seller specifically agree that all Liabilities under any product liability or other theory whatsoever (including breach of warranty, negligence, strict liability, violation of Law or otherwise) ("Product Liability") relating to raw materials, work in process or products that are part of the Purchased Assets (including the Product Inventory), whether manufactured or in the process of manufacture on or prior to the Closing Date by the Institute or the Division shall be included in the Assumed Liabilities; provided, however, that Seller's Retained Liabilities shall include Product Liability for products to which ownership has been transferred or delivered to third party customers prior to the Closing Date, including, but not limited to, any products currently held for the United States Department of Defense on the Institute premises under the Stockpile Agreement. Product Liability for products to which ownership is transferred or delivered to third party customers on or after the Closing Date shall be included in Purchaser's Assumed Liabilities.

(Asset Purchase Agreement, BioPort Br. Supp. Mot. Dismiss Ex. O, ¶ 1.5.3, at 7.) According to this paragraph's arrangement for apportioning products liabilities among buyer and seller, the state contractually retained potential liability for any vaccine where the ownership was transferred to the DOD before the September 4, 1998, closing date. BioPort assumed liability only for the vaccine to which it held title on that date or which it later manufactured (and Plaintiffs acknowledge that BioPort manufactured none of the vaccine at issue in this case). However, the Court cannot tell whether paragraph 1.5.3. was intended to govern in products liability lawsuits brought by purchasers of anthrax vaccine, or by injection recipients, or both. In other words, this provision sets out who is the proper defendant in a products liability action, but says nothing about who may be a proper plaintiff. In the face of this ambiguity, the Court cannot rule as a matter of law, at this time, on the issue of whether the Asset Purchase Agreement confers successor liability on BioPort with respect to Plaintiffs in this case.

Another unresolved issue arising from paragraph 1.5.3. concerns which lots of vaccine respectively fall within the assumed and retained liabilities. BioPort provides a chronology of relevant dates for all of the vaccine lots at issue in this case (lots FAV001 through FAV048) and proposes a method for designating when ownership of those lots transferred to the federal government. According to BioPort, the federal government acquired ownership of lots FAV001 through FAV039 pursuant to its execution of form DD250 ("Material Inspection and Receiving Report"), which occurred prior to the asset purchase transaction's September 4, 1998, closing date. Next, BioPort asserts that ownership of lots FAV040 and above passed to the government pursuant to F.A.R. Section 52.232–32, which provides in pertinent part:

Title. (1) Title to the property described in this paragraph (f) shall vest in the Government. Vestiture shall be immediately upon the date of the first performance-based payment under this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract.

48 C.F.R. § 52.232–32(f). BioPort uses the actual date the government was billed to determine the latest date on which a particular lot was "properly chargeable" to the government. According to BioPort, the State of Michigan billed the government for lots FAV040, FAV041, FAV042 and the first 164,480 doses of FAV043 before the closing date and therefore, title to these lots was transferred to the government prior to the closing. Of all the vaccine lots at issue, BioPort acknowledges "owning" only the following for purposes of paragraph 1.3.5 of the Asset Purchase Agreement: FAV043 (47,050 doses only) and FAV044 through FAV048. Thus, BioPort maintains that pursuant to the Asset Purchase Agreement, it assumed potential products liabilities only with respect to these lots. BioPort's method of assigning ownership dates to the vaccine lots may in the end prove correct, but at this stage of the lawsuit the Court is unprepared to say so conclusively.

**(3) Supplemental Testing Program**

■ Yet another dispute arises from Plaintiffs' recently-raised contention that BioPort incurs liability because it performed supplemental testing on over 2 million doses of vaccine that were later labeled, shipped, and sold to the DOD. Plaintiffs argue that BioPort's supplemental testing of lots previously manufactured and stored under the Stockpile Agreement effectively renders *all* vaccine tested a product and source of liability of BioPort, regardless of whether successor liability

attaches under paragraph 1.5.3. of the Asset Purchase Agreement. Moreover, Plaintiffs contend that the supplemental testing was faulty. The Court lacks sufficient factual and legal information to rule in BioPort's favor on this theory. Accordingly, Plaintiffs may proceed with it.

**D. Other Claims**

**(1) Federal Law Claims**

The Complaint's federal law claims are limited to allegations that Defendants violated Plaintiffs' constitutional substantive due process rights to "bodily integrity" and "human dignity." Plaintiffs bring these claims pursuant to 42 U.S.C. § 1983, which creates a federal cause of action against anyone who, acting under the color of state or local law, deprives another of rights guaranteed by the United States Constitution or federal law. The Court concludes that Plaintiffs have failed to state a claim for a violation of the constitutional right to bodily integrity, and that the right to human dignity has never been recognized as a constitutionally-protected right. Accordingly, the Court will dismiss all of Plaintiffs' federal law claims.

**(a) Bodily Integrity**

■ The right to bodily integrity is a fundamental right protected by the Constitution. "The right to be free of state-sponsored invasion of a person's bodily integrity is protected by the [constitutional] guarantee of due process." *In re Cincinnati Radiation Litig.*, 874 F.Supp. 796, 810–11 (S.D.Ohio 1995). As the Supreme Court has noted, "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994). The right to bodily integrity has long been recognized. *See*

*Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891) (holding that "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law"); *Schmerber v. California,* 384 U.S. 757, 772, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966) (stating that "[t]he integrity of an individual's person is a cherished value of our society").

■ Plaintiffs claim that they were subjected to unethical human experimentation, unwittingly serving as human guinea pigs in what amounted to a government-sponsored anthrax vaccine research experiment. Several federal courts have found violations of the fundamental right to bodily integrity in medical experiments on humans. The research subjects' rights were violated in these cases because either they were not told that they were participating in an experiment, or the government knew the experiments had no therapeutic value, or both. *See, e.g., Heinrich v. ·Sweet,* 62 F.Supp.2d 282 (D.Mass.1999) (government utilized false pretenses to lure plaintiffs into participating in radiation experiments which the government knew had no therapeutic value); *Stadt v. Univ. of Rochester,* 921 F.Supp. 1023 (W.D.N.Y.1996) (plaintiff, who thought she was receiving medical treatment for scleroderma, was injected with plutonium without her knowledge or consent as part of a U.S. Army study); *In re Cincinnati Radiation Litig.,* 874 F.Supp. 796 (S.D.Ohio 1995) (plaintiffs were not informed that the radiation they were receiving from the Department of Defense was part of a military experiment rather than treatment of their cancer).

These cases can be distinguished from the instant case in several ways. First, in each of these cases, the defendants actually performed the involuntary medical experiments. In contrast, Defendants in the instant case are merely the manufacturers of the anthrax vaccine, not the party who performed the alleged "experiments" on Plaintiffs. If the anthrax inoculation program constituted an experiment, the party conducting the experiment was the DOD, which of course is not being sued because it enjoys immunity under the *Feres* doctrine. *See Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (holding that military personnel may not sue the United States government for injuries sustained incidental to military service). The DOD made the decision to vaccinate the military, and the DOD implemented the vaccination program on its ˙personnel. Thus, under *Heinrich, Stadt,* and *Cincinnati,* Defendants—the vaccine's manufacturers—are not proper targets for allegations of right to bodily integrity violations.

Second, the *Heinrich, Stadt,* and *Cincinnati* cases involved the use of false pretenses and deception in order to secure the participation of the experimental subjects. In contrast, the instant case involves no allegations that military members were deceived into participating in the DOD's anthrax vaccination program. In fact, they had no choice in the matter; the vaccinations were mandatory. Plaintiffs all knew they were being injected with anthrax vaccine, and no false pretense or deception was necessary in order to get them to submit to the vaccinations. Plaintiffs do allege that Defendants deceived the federal government regarding the vaccine's safety and efficacy, but that is not the sort of deception found to support violations of the right to bodily integrity in *Heinrich, Stadt,* and *Cincinnati.*

Third, the *Heinrich, Stadt,* and *Cincinnati* cases involved medical experiments known to have no therapeutic value. In-

deed, the only purpose of the conduct in those cases was experimentation. Even if it were true that Defendants sought to use the DOD anthrax vaccination program to test the vaccine, there can be no question that other significant rationales supported the program. The DOD undeniably adopted the immunization program at least in part to advance the national security interest of protecting military personnel from biological warfare attacks.

The Supreme Court has admonished lower courts to exercise judicial restraint when asked to expand the rights protected by constitutional substantive due process. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). To hold that violations of the right to bodily integrity oc-•curred in the instant case would require this Court to chart new constitutional ground.

### (b) Human Dignity

 Plaintiffs also claim that Defendants violated their fundamental constitutional right to human dignity by subjecting them to medical experimentation. However, American constitutional jurisprudence has never recognized a right to human dignity. Even if the anthrax immunization program comprised a medical experiment, it cannot give rise to constitutional human dignity claims, and those claims in this case must be dismissed.

Plaintiffs support their argument by reciting the Nuremberg Code principal that voluntary consent of human subjects is essential in medical experiments. No Supreme Court decision, however, has adopted the Nuremberg Code as constitutional law. Plaintiffs cite *United States v. Stanley*, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), in which a former Army soldier sued the United States for subjecting him to LSD experimentation without his knowledge or consent. Justice

Brennan's dissent in *Stanley* argued for the recognition of a constitutional right to "essential human dignity" based on the Nuremberg Code. *Id.* at 687, 107 S.Ct. at 3066. Justice O'Connor's dissent likewise harkened to the Nuremberg Code in arguing that involuntary, unknowing human experimentation comprised a constitutional violation. *Id.* at 710, 107 S.Ct. at 3066. However, the Supreme Court's ruling rejected the human dignity claim under the *Feres* doctrine, which holds that military servicemembers cannot sue the federal government for putting them in harm's way. Plaintiffs in this case contend that the holding implicitly acknowledged that Stanley would have had a constitutional claim if not for the *Feres* doctrine. That speculation, however, is insufficient to establish a constitutional right.

A recent district court case rejected an attempt to assert a constitutional right to human dignity. *See Robertson v. McGee*, No. 01CV60, 2002 WL 535045 (N.D.Okla. Jan.28, 2002). The plaintiffs in *Robertson* sought to establish federal question jurisdiction by bringing a § 1983 action alleging the violation of a purported federal constitutional right "to be treated with dignity." *Id.* at *2. The *Robertson* Plaintiffs contended that the human dignity right expressed in the Nuremberg Code and the Helsinki Declaration should be imputed into the U.S. Constitution. *Id.* at *3. With respect to this argument, the court stated the following:

This Court agrees with other jurisdictions which have found that there is no private right of action for an alleged violation of international law for the protection of human research subjects under the Declaration of Helsinki and the Nuremberg Code. *See, e.g., White v. Paulsen*, 997 F.Supp. 1380, 1383 (E.D.Wash.1998), and *Hoover v. West Virginia Department of Health and Human Resources*, 984 F.Supp. 978

(S.D.W.Va.1997) aff'd 129 F.3d 1259 (4th Cir.1997). Moreover, the standard in the United States for conducting research on human subjects is contained in the Code of Federal Regulations and, thus, there is no need for the courts to resort to international law to impute a standard.

*Id.*

Plaintiffs cite several other cases purportedly embracing a constitutional right to human dignity. Examination of these cases, however, reveals that they were decided on bodily integrity grounds in the context of non-therapeutic experimentation. As the Court has noted above, bodily integrity is a constitutionally protected right. Because the right to human dignity is not, Plaintiffs fail to state a claim for violation of that purported right.

**(2) Fraud Claims**

At a hearing held on December 3, 2003, Plaintiffs retracted the fraud count in their Complaint. Accordingly, the fraud claims will be dismissed.

**E. Other Defenses**

**(1) BioPort—Inheriting the State's Sovereign Immunity**

BioPort argues that even if potential liability attaches under the successor liability theories discussed *supra,* a successor company cannot inherit the liabilities of a predecessor without also inheriting the predecessor's defenses and immunities to those liabilities. BioPort thus contends that its predecessor's sovereign immunity under the Eleventh Amendment also immunizes BioPort from suit.

The case BioPort cites for support does not back up this proposition. In that case, *Herbolsheimer v. SMS Holding Company, Incorporated,* 239 Mich.App. 236, 608 N.W.2d 487 (2000), the plaintiff's decedent was barred under the Michigan workers' compensation statute from recovering against the predecessor company, which had been the plaintiff's employer. The court held that the plaintiff's decedent was therefore also barred from recovering against the employer's successor as well, stating:

Simply being a successor in liability does not make a company liable—there must be an allegedly viable legal claim against the predecessor in order for the case to survive a motion for summary disposition. In addition, in determining the existence of a legal claim, we must also examine the defenses and immunities of the predecessor, since a company cannot inherit the liabilities without the defenses of the predecessor. It is inherently logical that a company cannot be liable if there was a legal defense or immunity to the allegedly tortious action, and in that case there would thus have been no liability for the successor to succeed.

*Id.* at 252, 608 N.W.2d at 496. *Herbolsheimer* involved a corporate predecessor and a corporate successor, whereas this case involves a state government predecessor and a corporate successor. BioPort has provided no indication that the rule applicable to the former situation also applies to the latter. In other words, BioPort provides no support for this Court to hold that the successor to a state government predecessor with sovereign immunity inherits that immunity.

**(2) Michigan Drug Manufacturers Products Liability Immunity Statute**

Michigan law immunizes drug manufacturers from products liability actions so long as the FDA approved the drug and its labeling complied with FDA standards. However, even if these requirements are fulfilled, a drug manufacturer is not immune if it intentionally withholds from or misrepresents to the FDA certain information. The relevant statute provides:

(5) In a product liability action against a manufacturer or seller, a product that is a drug is not defective or unreasonably dangerous, and the manufacturer or seller is not liable, if the drug was approved for safety and efficacy by the United States food and drug administration, and the drug and its labeling were in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller. However, this subsection does not apply to a drug that is sold in the United States after the effective date of an order of the United States food and drug administration to remove the drug from the market or to withdraw its approval. This subsection does not apply if the defendant at any time before the event that allegedly caused the injury does any of the following:

(a) Intentionally withholds from or misrepresents to the United States food and drug administration information concerning the drug that is required to be submitted under the federal food, drug, and cosmetic act ... and the drug would not have been approved, or the United States food and drug administration would have withdrawn approval for the drug if the information were accurately submitted.

M.C.L. § 600.2946(5).

BioPort argues that this statute immunizes it from Plaintiffs' lawsuit because no anthrax vaccine ever left BioPort or MDPH–MBPI's facilities before it was tested and approved for release by the FDA, because the labeling complied with FDA standards, and because the manufacturer did not withhold from or misrepresent material information from the FDA. Plaintiffs challenge BioPort on each of these points. In addition, Plaintiffs argue that under Michigan choice of law rules, this Court should not apply Michigan law in the first place, so that Michigan's drug manufacturer products liability immunity statute has no bearing on this case. The Court concludes that Michigan law, including the products liability immunity statute, applies, but the Court cannot at this stage rule as a matter of law that the immunity statute's requirements have been met.

### (a) Choice of Law

■ A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Therefore, this Court will apply Michigan's choice of law rules. The Michigan Supreme Court clarified this state's choice of law principles in *Olmstead v. Anderson*, 428 Mich. 1, 400 N.W.2d 292 (1987). According to *Olmstead*, the law of the forum is the presumptive rule for choice of law issues in tort cases, but ultimately the issue must be decided using an interest-weighing approach on a case-by-case basis. *Id.* at 24, 29–30, 400 N.W.2d at 302, 305–305. In a similar vein, the Sixth Circuit, considering facts similar to those in the present case, explained:

We think it very clear from the lengthy discussion in *Olmstead* that the Michigan Supreme Court would hold, in a suit brought in a Michigan court by a party who is not a citizen of Michigan against a Michigan resident, arising out of an accident that occurred outside of Michigan and in the state of the plaintiff's residence, that Michigan law as the forum law presumptively controls the litigation; and further, that there must be a rational reason to displace Michigan law.

*Mahne v. Ford Motor Co.*, 900 F.2d 83, 86–87 (6th Cir.1990). As this passage indi-

cates, the law of the forum applies unless a rational reason exists to displace it. The Michigan Supreme Court, applying *Olmstead,* explained the two-step "rational reason" analysis as follows:

> [W]e will apply Michigan law unless a "rational reason" to do otherwise exists. In determining whether a rational reason to displace Michigan law exists, we undertake a two-step analysis. First, we must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests.

*Sutherland v. Kennington Truck Serv., Ltd.,* 454 Mich. 274, 286, 562 N.W.2d 466, 471 (1997).

Plaintiffs contend that Michigan law should be displaced in the present case because the interests of other forums (i.e., Maryland, Virginia, the District of Columbia, or the states where Plaintiffs were injected with anthrax vaccine) supersede Michigan's interests. To be sure, this case involves conduct that took place outside of Michigan. The *Ammend* and *Fleming* plaintiffs are residents of other states and were injected with anthrax vaccines in other states or foreign countries. The anthrax vaccine contracts were executed at Fort Detrick, Maryland, and the FDA is located in Rockville, Maryland. Research on adverse reactions to the anthrax vaccine took place in the District of Columbia. Decisions regarding the anthrax vaccine contracts and the Defense Department's anthrax vaccination program were made in Maryland, the District of Columbia, or Virginia, none of which have drug manufacturer liability immunization statutes like Michigan's.

Nevertheless, the Court disagrees with Plaintiffs and finds that there is no rational reason to displace Michigan law. The interests of foreign states in this action are relatively minor. Although the anthrax vaccine production contracts were executed in Maryland, the contracts are not the subject of this dispute. Maryland would seem to have little interest in applying its products liability law to this case. Also, although federal government entities made decisions regarding the anthrax vaccination program in the District of Columbia and Virginia, this lawsuit is not about those decisions or against those entities. In fact, the United States District Court for the District of Columbia transferred the *Allaire* case to this district because Plaintiffs failed to allege sufficient contacts with the forum to establish personal jurisdiction over Defendants. Judge Kollar-Kotelly's opinion stated: "The contacts between Defendants and federal government agencies are not the alleged source of plaintiffs' injury; plaintiffs maintain their harm was the result of wrongdoing by Defendants in the production of the vaccine, which was performed in Michigan. To agree with plaintiffs ... would violate the traditional notions of fair play and substantial justice." (1/7/03 Mem. Op., Pl.'s Br. Opp. Mot. Dismiss Ex. A, at 8.) (quotation marks and citation omitted). The Western District of Louisiana transferred the *Fleming* case to this district, also for lack of personal jurisdiction over Defendants. That these forums lacked sufficient contacts with Defendants to support jurisdiction suggests that they also have little interest in the application of their law to this case.

In addition, Michigan's interest in applying its law to this case strongly outweighs the interests of any foreign states. All Defendants—BioPort, MDPH–MBPI, and Dr. Myers—are Michigan residents with principal places of operation in Michigan. The anthrax vaccine which Plaintiffs allege

harmed them was produced in Michigan. Moreover, the Michigan legislature has expressly recognized Michigan's interest in regulating drug product manufacturers by enacting a drug product liability immunity statute, M.C.L. § 600.2946(5). Therefore, Michigan law, including the drug product liability immunity statute, controls in this case.

### (b) Application of Statute

■ Having determined that Michigan law controls, the Court must next consider whether the conditions of Michigan's drug manufacturer products liability immunity statute are met, and if so, whether an exception nonetheless applies. The statute provides immunity only if the FDA approved the drug and the drug was properly labeled. M.C.L. § 600.2946(5). Even then, an exception provides that a drug manufacturer receives no immunity if it withholds certain information from or misrepresents such information to the FDA, and the FDA would not have approved the drug or would have withdrawn approval had it been fully informed. *Id.* Because fact issues regarding whether the statute's requirements are met and whether the exception applies remain outstanding in this case, the Court cannot rule as a matter of law that the statute immunizes Bio-Port.

Defendants argue that the immunity statute's FDA approval and labeling requirements are satisfied because no lots of anthrax vaccine used in the immunization program left the BioPort or MBPI facilities before being tested and approved for release by the FDA and because the vaccine's labels and package inserts met with FDA approval. However, Plaintiffs allege that the anthrax vaccine Defendants produced was not the FDA-approved version of the vaccine. Plaintiffs further allege that the only testing done by the FDA, if any, was on the potency of the anthrax vaccine, not its sterility, and that with respect to the majority of lots at issue in this case, the FDA conducted no testing. In addition, Plaintiffs contend that the vaccine's product insert was inaccurate, and that the vaccine was adulterated and misbranded when it was provided to the DOD. It is evident that issues of material fact regarding the immunity statute's approval and labeling requirements remain disputed.

Dispute also exists regarding the exception for withholding or misrepresenting information. Plaintiffs allege numerous instances of this sort of behavior by Defendants, including that: (1) in 1992, Dr. Myers withheld information from the FDA regarding a link between malformed babies and anthrax vaccine; (2) in 1993, MDPH and Dr. Myers withheld information from the FDA regarding a soldier who may have had a systemic reaction to the anthrax vaccine; (3) in 1994, Dr. Myers intentionally misrepresented information to the FDA, stating that the anthrax vaccine was not associated with any chronic or permanent local or systemic reactions and that there had been no reports of adverse effects during or since the Persian Gulf War; (4) for ten years, MDPH–MBPI and BioPort failed to notify the FDA of changes in the process and equipment used to manufacture vaccine; (5) in 1998, the FDA found that MBPI misrepresented the actual expiration dates of numerous lots of anthrax vaccine; (6) on September 16, 1998, Dr. Myers intentionally misrepresented information to the FDA by informing the agency that the anthrax vaccine had a "very, very low" rate of systemic reactions; and (7) in October 2001, the GAO reported that the anthrax vaccine's manufacturing process had been changed without the FDA being notified. Given these allegations, and the uncertainty as to whether the FDA would have withheld or withdrawn approval if the facts alleged are true had the FDA known of them, the Court cannot rule as a

matter of law that the exception does not apply.

### (3) *Feres* Doctrine

The *Feres* doctrine precludes members of the armed forces from suing the United States government for injuries sustained incidental to military service. *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Defendants' attempt to raise this defense is misplaced, as the United States government is not a defendant in this case. Defendants have cited no authority extending the *Feres* doctrine to shield parties other than the federal government. Therefore, the *Feres* doctrine has no bearing on this matter, notwithstanding Defendants' protestations that Plaintiffs' lawsuit comprises a challenge to the DOD's mandatory inoculation order and therefore implicates the U.S. government.

### (4) Government Contractor Defense

BioPort seeks to raise the government contractor defense as grounds for dismissal of Plaintiffs' claims. The government contractor defense provides an affirmative defense to state tort liability by extending the sovereign immunity of the United States to contractors who manufacture products for the federal government. At this stage of the litigation, the Court cannot rule that the defense's requirements are established as a matter of law. Therefore, the Court concludes that the government contractor defense does not support granting the motion to dismiss Plaintiffs' claims.

 The government contractor defense requires a defendant to establish that (1) the United States government approved reasonably precise specifications; (2) the product conformed to those specifications; and (3) the contractor warned the United States government about dangers associated with the use of the product known to the manufacturer but not to the government. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988). Liabilities stemming from both "design defects" and "manufacturing defects" may fall within the defense's ambit. *See, e.g., Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 801–802 (5th Cir.1993) ("In sum, the government contractor defense does not necessarily apply only to claims labeled 'design defect.' Whether it will apply to a particular claim depends only upon whether *Boyle's* three conditions are met with respect to the particular product feature upon which the claim is based."). The Court will discuss each *Boyle* prong in turn.

### (a) Prong 1: Government Approval of Reasonably Precise Specifications

 The first prong of the government contractor defense requires a showing of "government approval of reasonably precise specifications." *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518. "Approval" under the *Boyle* defense "requires more than a rubber stamp." *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir.1989). Rather, approval must constitute a "discretionary function" of the government. *Id.* Discretionary functions are government acts "that involve the use of policy judgment." *Id.* The "reasonably precise specifications" requirement "means that the discretion over significant details and all design choices will be exercised by the government. If the government approved imprecise or general guidelines, then the discretion over important design choices would be left to the government contractor." *Id.* at 1481. On the other hand, the government is not required to instruct the manufacturer in how to make the product. "The government need not actually participate in the process of design at all—simple approval of a manufacturer's design is acceptable." *Haltiwan-*

ger v. Unisys Corp., 949 F.Supp. 898, 902–903 (D.D.C.1996). "While blind acceptance of a design does not constitute sufficient government discretion, only government review and approval of the specifications is required by the case law, and acceptance after genuine ·consideration and informed judgment satisfies the first prong of Boyle." Id. at 903.

■ BioPort argues that the first Boyle requirement is satisfied for three reasons: (1) the method for manufacturing anthrax vaccine was invented and patented by the government; (2) the DOD has been intimately involved with the production of anthrax vaccine from its inception by engaging in a continuous back-and-forth with the vaccine's producers; and (3) the supplemental testing specifications dictated by the DOD in the wake of the FDA's observations about manufacturing issues are stand-alone, government-approved, reasonably precise specifications. In response, Plaintiffs begin by cautioning against reliance on the government documents BioPort offers in support of its position because the government has agreed to indemnify BioPort and therefore may be biased. Plaintiffs also contend that the government did not approve reasonably precise specifications for the anthrax vaccine used to inoculate Plaintiffs. Instead, Plaintiffs argue, by the time the government bought the vaccine at issue in this case, the vaccine was an off-the-shelf, stock product purchased pursuant to contracts devoid of specifications. Plaintiffs further allege that the supplemental testing program does not satisfy the first Boyle prong and that in any event the DOD failed to complete the program and the FDA was never appraised of the results. In light of the parties' competing

accounts, questions of fact exist as to whether the government approved reasonably precise specifications and it would be premature to find the first Boyle prong established as a matter of law.

**(b) Prong 2: Product's Conformity to Government Specifications**

The second prong of the government contractor defense requires a defendant to establish that the product conformed to the reasonably precise specifications approved by the government." Boyle, 487 U.S. at 512, 108 S.Ct. at 2518. BioPort contends that this requirement is satisfied for two reasons: (1) the DOD required supplemental testing of the anthrax vaccine used to inoculate Plaintiffs and set forth detailed specifications for the testing; and (2) the DOD engaged in continuous back-and-forth involvement with the anthrax vaccine manufacturers. According to BioPort, documents appropriate for judicial notice show that the DOD was aware of any alleged contaminations before it accepted delivery of the vaccine lots used to inoculate Plaintiffs.

Plaintiffs counter that even if the government had approved reasonably precise specifications, the vaccine failed to conform to those specifications and was in fact manufactured in violation of federal safety requirements. Plaintiffs allege a long list of vaccine manufacturing process defects which led the FDA to shut down the production line. Plaintiffs also dispute the efficacy and validity of the supplemental testing program. The Court agrees with Plaintiffs that questions of fact exist as to whether the vaccine was manufactured in accordance with government specifications[4] and whether the testing program substantiates the vaccine's conformity to

---

4. In a related case, U.S. ex rel. Dingle v. BioPort, 270 F.Supp.2d 968 (W.D.Mich.2003), this Court took judicial notice of documents offered by the plaintiffs which stated that

"there are many potential deviations between the vaccine that was approved by the FDA and the vaccine that was actually produced."

specifications. Accordingly, the Court declines at this point to conclude that Bio-Port has established the second *Boyle* prong.

### (c) Prong 3: Contractor Warning Government About Known Dangers

The third prong of the government contractor defense requires proof that the contractor warned the United States government about known dangers associated with the use of the product. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518. "If the government was already independently aware of a risk and chose to act regardless of the knowledge, [a] defendant may still employ the government contractor defense without further warning the government." *Haltiwanger,* 949 F.Supp. at 904 (citing *Stout v. Borg–Warner Corp.,* 933 F.2d 331, 336–37 (5th Cir.1991)). Defendants argue that the DOD was fully aware of all benefits and risks of anthrax vaccine, and after weighing this information, chose to go forward with the inoculation program. However, a primary thrust of Plaintiffs' claims is that Defendants negligently produced a contaminated, unsafe vaccine whose dangers the DOD did not know. Plaintiffs further allege that Defendants misrepresented the vaccine's risks. Numerous questions of fact remain as to whether these dangers existed and if so, whether Defendants warned the government or whether the government knew of the dangers on its own.

### IV. *Conclusion*

For the reasons stated above, all claims against MDPH–MBPI will be dismissed because these Defendants were State of Michigan entities and therefore enjoy sovereign immunity from suit under the Eleventh Amendment. Plaintiffs' constitutional right to human dignity and right to bodily integrity claims will be dismissed as to all Defendants for failure to state claims upon which relief can be granted. Plaintiffs' fraud claims will be dismissed as to all Defendants by virtue of Plaintiffs' concession. Dr. Myers' motion to dismiss will be granted with respect to Plaintiffs' official capacity claims based on Eleventh Amendment sovereign immunity grounds but will be denied with respect to the state law individual capacity claims because Dr. Myers has not established immunity to those claims as a matter of law. Plaintiffs' claims against BioPort, aside from the right to bodily integrity and human dignity claims, survive because BioPort has not established the defenses it asserts as a matter of law and because BioPort may have assumed successor liability.

An Order consistent with this Opinion will follow.

---

*Id.* at 976. The Court itself stated that "[o]ne would reasonably conclude that the vaccine being produced and sold to the Government before or after the changes would have been different from that which was approved by the FDA. An inference of fraud can also be drawn from the House Report, which noted that the Lansing plant had been cited numerous times for deviating from FDA regulations and problems that arose during potency testing." *Id.* at 977.