Jeanette McMAHON, as Personal Representative of the Estate of Michael McMahon; Tracy Grogan, as Personal Representative of the Estate of Travis Grogan; and Sarah Miller, as Personal Representative of the Estate of Harley Miller, Plaintiffs,

v.

PRESIDENTIAL AIRWAYS, INC., Aviation Worldwide Services, LLC, Sti Aviation, Inc., Air Quest, Inc., Defendants.

No. 6:05–CV–1002ORL28JGG.

United States District Court,
M.D. Florida.
Orlando Division.

Sept. 27, 2006.

Galen D. Bauer, Robert B. Guild, Robert F. Spohrer, Sean B. Cronin, Spohrer, Wilner, Maxwell & Matthews, P.A., Jacksonville, FL, for Plaintiffs.

J. Denny Shupe, Schnader, Harrison, Segal & Lewis, LLP, Philadelphia, PA, Jonathan M. Stern, Schnader, Harrison, Segal & Lewis, LLP, Robert L. Elam, Greenberg Traurig, LLP, Michael P. Socarras, McDermott, Will & Emery, Washington, DC, John Armando Boudet, Greenberg Traurig, P.A., Orlando, FL, Mark P. Schnapp, Sabrina R. Ferris, Greenberg Traurig, P.A., Miami, FL, for Defendants.

Carolyn J. Adams, U.S. Attorney's Office, Orlando, FL, Justin Chretien, Aviation & Admiralty Litigation, Department of Justice, Washington, DC, for Intervenor.

## ORDER

ANTOON, District Judge.

This cause is before the Court on Defendants' Motion to Dismiss (Doc. 40), to which Plaintiffs have filed a Memorandum in Opposition (Doc. 56). Having considered the parties' arguments and pertinent law, the Court concludes that Defendants' motion must be denied.

### I. BACKGROUND

Plaintiffs are survivors of three United States servicemen who were killed on November 27, 2004, when the airplane in which they were being flown crashed in Afghanistan. They have sued Defendants, who "contracted with the United States of America ... to provide air transportation and operational support services to the Department of Defense ("DoD") in Afghanistan." (Am. Compl., at 3, ¶ 13.) The contract governing the terms of the agreement includes an attachment known as the Statement of Work,[1] and it provides that the contractor personnel are to comply with FAA regulations in performing under the contract. (Statement of Work ¶¶ 1.3, 1.4, 1.8, 4.4) (hereinafter "SOW".)

### II. DISCUSSION

Defendants have raised three arguments in support of their Motion to Dismiss the Amended Complaint. They argue that this case presents a nonjusticiable political question that the court should decline to decide. Defendants also contend that even though they are civilian contractors, they enjoy intra-military immunity under the *Feres* doctrine[2], requiring dismissal. Finally, Defendants argue that the combatant activities exception to the Federal Tort Claims Act ("FTCA") applies, barring this state tort lawsuit.

### A. *The Political Question Doctrine*

Defendants contend that this case presents a nonjusticiable political question because "[t]he manner in which the President oversees and commands these military operations, including his deci-

---

**1.** This Court recently granted Defendants' Motion to Strike (Doc. 65) the exhibits attached to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss. (Doc. 112.) Defendants specifically objected to some exhibits, but did not expressly object to Plaintiffs' inclusion of the Statement of Work, apart from noting that the exhibits were voluminous and would convert the consideration of their motion into one for summary judgment. (Doc.65 at 5.) However, Defendants cited portions of the Statement of Work at oral argument and failed to object when Plaintiffs relied on both the Statement of Work and the contract. (Doc. 106, Trial Tr. 7:18–11:2; 37:1–14; 41:6–42:5; 75–16–79:21.) This Court will consider the Statement of Work to the limited extent it aids in disposing of this motion.

**2.** *Feres v. United States*, 340 U.S. 135, 146, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (immunizing the United States from liability for claims by service members that are "incident to service").

sions through the chain of command concerning the training, deployment, armament, missions, composition, planning, analysis, management and supervision of private military contractors and their missions, is beyond the role of the courts." (Defs.' Mem. at 17.) Defendants claim that "[a]ny consideration by this Court of plaintiffs' claims would necessarily encroach on military decision-making constitutionally committed to the coordinate branches of government." (*Id.* at 18.)

### 1. The Basis of the Doctrine

■ The reluctance with which the judiciary broaches political questions is a function of the division between the three branches of government and their roles as dictated by the Constitution. *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The judiciary properly refrains from deciding controversies that the Constitution textually commits to another political branch and cases that are beyond the competence of the courts to resolve because of the lack of judicially manageable standards. *Id.* at 217, 82 S.Ct. 691. In its landmark decision of *Baker v. Carr*, the Supreme Court identified other characteristics of political questions, including the embarrassment that flows from conflicting pronouncements by coordinate political branches of Government, an unusual need for adherence to a political decision already made, the prerequisite of an initial policy determination by another branch of Government, and the risk of disrespecting either the Legislative or the Executive branches. *Id.*

■ The political question doctrine does not, however, allow courts to avoid deciding cases merely because they have "political overtones or questions they might categorize as 'political,'" *El–Shifa Pharmaceutical Industries Co. v. United States*, 378 F.3d 1346, 1362 (Fed.Cir.2004), and "[t]he decision that a question is non-justiciable is not one courts should make lightly." *Id.* Indeed, it is with increasing rarity that a case is dismissed on political question grounds. *See In re Agent Orange Prod. Liab. Litig.*, 373 F.Supp.2d 7, 65–69 (E.D.N.Y.2005) (citing academic authority regarding the questionable utility of the doctrine and the scant case law applying the doctrine successfully since *Baker*). In 2000, the Supreme Court failed to even mention the doctrine in its historic decision of *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), an omission which has led some to question the doctrine's continuing vitality. *See* Erwin Chemerinsky, *Bush v. Gore Was Not Justiciable*, 76 Notre Dame L.Rev. 1093 (2001); Lawrence Tribe, *EROG v. HSUB and its Disguises: Freeing Bush v. Gore from its Hall of Mirrors*, 115 Harv. L.Rev. 170, 276–87 (2001).

### 2. Private Defendants

The doctrine has been applied in very limited circumstances, but it has almost never been applied to suits involving private defendants. As the Ninth Circuit Court of Appeals noted in *Koohi v. United States*, 976 F.2d 1328, 1332 n. 3 (9th Cir. 1992), as of 1992, that court could not find a single decision by the Supreme Court or any Court of Appeals dismissing a suit against a private party on political question grounds. Defendants have failed to cite such a case decided since *Koohi*.

Some federal district courts have invoked the doctrine in suits brought against private defendants. All are inapposite to the case at bar. In some of the cases, the United States was either named as a party, or it intervened to protect its own interests and raised the political question doctrine as a basis for dismissal. *See Bentzlin v. Hughes Aircraft Co.*, 833 F.Supp. 1486, 1487 (C.D.Cal.1993) ("The

United States, as intervenor ..., moved to dismiss ... under the political question and state secrets doctrines."); *Zuckerbraun v. Gen. Dynamics Corp.,* 755 F.Supp. 1134, 1135–36 (D.Conn.1990) ("The United States also argues that the political question doctrine renders the case nonjusticiable and requires dismissal."); *Nejad v. United States,* 724 F.Supp. 753, 755 (C.D.Cal.1989). Notably, the United States has not chosen to intervene on behalf of Defendants in this case.

In three of the district cases that applied the political question doctrine to insulate private parties from suit, the courts emphasized the control the United States had over either the conduct at issue or the private party defendants. For example, in *Smith v. Halliburton Co. (Smith II),* the military had absolute control over the services that the plaintiffs claimed the private defendants had performed negligently. No. H–06–0462, 2006 WL 2521326, at *3–4, 5, 2006 U.S. Dist. LEXIS 61980, at *15–16, 20, 22 (S.D.Tex. Aug. 30, 2006). Since the military was solely responsible for the provision of security, the political question doctrine was rightly implicated. *Id.; see also Fisher v. Halliburton, Inc. (Fisher II),* No. H–05–1731, slip op. at 3, 12–13 (S.D.Tex. Sept. 22, 2006) (holding that the contractor's conduct was "inextricably intertwined" with that of the Army in claims arising out of anti-American attacks on a convoy in Iraq). The final case cited by Defendants in which a suit against a private party was dismissed under the political question doctrine is *Whitaker v. Kellogg Brown & Root, Inc.,* 444 F.Supp.2d 1277 (M.D.Ga.2006). *Whitaker,* involving a supply convoy accident in Iraq. *Id.* at *1, 2006 U.S. Dist. LEXIS 61980, at *1. The degree of control that the military exercised over the operation of the convoy is not clear from the facts, though the *Whitaker* court ultimately concluded that the military control was extensive, *id.* at *3, 2006 U.S. Dist. LEXIS 61980, at *12–13.

To the extent that *Whitaker* involved ordinary tort allegations that did not implicate military decision-making, this Order is in conflict with *Whitaker*'s conclusion. *See also Carmichael v. Kellogg, Brown & Root Servs., Inc.,* 450 F.Supp.2d 1373, 1376 (N.D.Ga.2006) (disagreeing with *Whitaker*'s conclusion and instead emphasizing whether the claims require "inquiries regarding military decision-making"). However, if the level of military control over the *Whitaker* convoy was so high as to implicate military strategy and procedure, as that court seemed to conclude, *see id.* at 1375–77, then it is distinguishable from the allegations here.

██ It is possible to imagine cases against private defendants that pose nonjusticiable political questions. However, *Baker*'s requirements—which center on the relationships between the coordinate branches of government—ensure that the class of political question cases against private defendants will be exceedingly small. Insofar as private contractors are concerned, political questions may be presented only in those rare instances when the private actors are so constrained by military command that their actions are rightly attributable to the Executive branch.

### 3. The Political Question Doctrine and War

██ Controversies stemming from war are not automatically deemed political questions merely because militaristic activities are within the province of the Executive. *Koohi,* 976 F.2d at 1331 ("Nor is the lawsuit rendered judicially unmanageable because the challenged conduct took place as part of an authorized military operation."); *In re Agent Orange,* 373 F.Supp.2d at 64 ("Justiciability is not eliminated because of possible interference with executive power even in wartime.") (citing *Rasul v. Bush,* 542 U.S. 466, 483–84, 124 S.Ct.

2686, 159 L.Ed.2d 548 (2004)); *cf. Nation Magazine v. United States Dep't of Def.,* 762 F.Supp. 1558, 1566–67 (S.D.N.Y.1991) ("Civilian courts should 'hesitate long before entertaining a suit which asks the court to tamper with the ... necessarily unique structure of the Military Establishment.'") (quoting *Chappell v. Wallace,* 462 U.S. 296, 300, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983)). Tort suits are within the province of the judiciary, and that conclusion is not automatically negated simply because the claim arises in a military context, or because it bears tangentially on the powers of the executive and legislative branches. Military-related cases that constitute political questions have been limited to "direct challenges to the institutional functioning of the military in such areas as the relationship between personnel, discipline, and training ... [or challenges] impact[ing] upon the internal functioning and operation of the military." *Nation Magazine,* 762 F.Supp. at 1567.

Defendants emphasize decedents' status as military service personnel as a basis for invoking the political question doctrine. In both *Koohi* and *Bentzlin,*[3] the courts rested their justiciability determinations on the status of the plaintiffs, reaching opposite conclusions. In *Koohi,* the Ninth Circuit rejected the political question argument in a claim brought by "enemy" civilians against private military defense contractors. 976 F.2d at 1331–32 (emphasizing the Government's "intrusion into the civilian sector") (quoting *Laird v. Tatum,* 408 U.S. 1, 15–16, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). By contrast, the *Bentzlin* court did accept the defendants' political question argument and distin-

guished *Koohi* solely on the identity of the plaintiffs: *Koohi* 's plaintiffs were civilians, while *Bentzlin* 's were the families of deceased marines. *Bentzlin,* 833 F.Supp. at 1497–98. However, this distinction, based on the status of the plaintiffs as survivors of members of the armed forces, is an insufficient basis for removing the instant tort claims from the province of the courts.[4] There is no authority on which to dismiss a claim on political question grounds because of the plaintiffs' status.

■ The status of the parties—that is, private or government, civilian or military—does not provide a reliable gauge of whether a political question is implicated in a particular case. There is, however, a circumstance which does generally trigger application of the political question doctrine—injury or death as a result of direct combat-like activity. *See Aktepe v. United States,* 105 F.3d 1400, 1403–04 (11th Cir. 1997) (Turkish destroyer struck by live missiles fired by American carrier during training exercise); *Fisher II,* at 3 (convoy attacked by anti-American forces); *Bentzlin,* 833 F.Supp. at 1487, 1497–98 (light-armored vehicle struck by Air Force missile); *Zuckerbraun v. Gen. Dynamics Corp.,* 755 F.Supp. 1134, 1136 (D.Conn. 1990) (USS *Stark* fired on by Iraqi aircraft); *Nejad,* 724 F.Supp. at 755 (civilian Iranian aircraft shot down by USS *Vincennes*-the same incident as the one addressed in *Koohi* ). The *Koohi* court did not focus on this aspect of the case, and even though *Koohi* was ultimately dismissed on other grounds, it has been suggested that the Ninth Circuit incorrectly decided the justiciability issue. *See* Bar-

---

3. *Koohi* and *Bentzlin* are also relevant to Defendants' "combatant activities exception" argument and will be discussed separately with respect to this issue. *See infra* Part C.

4. *See Lessin v. Kellogg, Brown & Root,* No. H–05–01853, 2006 U.S. Dist. LEXIS 39403, at *8

n. 1 (S.D. Tex. June 12, 2006) ("[T]he identity of the *litigant* is immaterial to the presence of [political question] concerns in a particular case.") (quoting *United States v. Munoz–Flores,* 495 U.S. 385, 394, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990)).

bara Burgess Hillson, Comment, Koohi v. United States: *The Ninth Circuit Leads Federal Jurisdiction into Battle*, 28 Ga. L.Rev. 269, 283–90 (1993).

■ Claims implicating decisions made by military personnel during combat trigger the political question doctrine because those claims require courts to delve into areas unfit for judicial scrutiny. *Lessin v. Kellogg, Brown & Root*, No. H–05–01853, 2006 U.S. Dist. LEXIS 39403, at *8–9 (S.D. Tex. June 12, 2006); *Carmichael*, 450 F.Supp.2d at 1375–76. Courts have no guidepost with which to evaluate military strategy and they cannot apply traditional standards of care to war. However, the application of the doctrine has little, if anything, to do with the military-status of the plaintiff-decedent, as suggested in *Bentzlin* and *Koohi*. This was demonstrated in *Zuckerbraun*, where a naval sailor was killed, along with thirty-six others, when an Iraqi aircraft fired upon the USS *Stark* in the Persian Gulf. 755 F.Supp. at 1135. His family sued private defense contractors alleging that the *Stark*'s weapons system was defectively designed and manufactured. *Id.* The United States intervened and moved to dismiss, invoking the political question doctrine. *Id.* at 1135–36. The case was dismissed, *id.* at 1142, but not because the claim was brought on behalf of a deceased member of the military. Rather, the court dismissed the action because addressing the merits would have required the court to review questions of military strategy and evaluate the appropriateness of the rules of engagement as well as the strategic responses of the USS *Stark* crew. *Id.* Because the claim would require the court to consider "whether reasonable care was taken to achieve tactical objectives in combat while minimizing injury and loss of life[,]" it was nonjusticiable. *Id.* (citing *Rappenecker v. United States*, 509 F.Supp. 1024, 1030 (N.D.Cal.1980)). *Zucker-*

*braun*'s reasoning comports with the requirements of *Baker v. Carr*, while *Bentzlin*'s identity-of-the-plaintiff reasoning marks a sweeping generalization unsupported by precedent.

■ Claims arising from war that require a court to evaluate the executive's military strategy, tactical decision-making, or calculated operations are typically nonjusticiable political questions. *See Carmichael*, 450 F.Supp.2d at 1375 ("[C]laims are barred by the political question doctrine if 'military decision-making or policy would be a necessary inquiry, inseparable from the claims asserted'") (quoting *Lessin*, 2006 U.S. Dist. LEXIS 39403, at *7); *Bentzlin*, 833 F.Supp. at 1497 (holding that judicial resolution required factual inquiry into military strategy and military orders given to troops); *Zuckerbraun*, 755 F.Supp. at 1142 (noting that judicial resolution would require the court to "examine the appropriateness of the rules of engagement[,] . . . the standing orders, . . . [and] the appropriateness of the [crew's] reaction . . . ."); *Vogelaar v. United States*, 665 F.Supp. 1295, 1303 (E.D.Mich.1987) (collecting military-related cases and noting that political questions "typically challenge strategic military decisions").

■ By contrast, cases involving traditional tort liability—even if they relate to the military or occur during a time of war—are capable of judicial resolution. The judicial standards required are no different than in ordinary tort actions; it is simply the context that has changed. *See Vogelaar*, 665 F.Supp. at 1304 (comparing the process of identifying war remains that were returned to the United States to the negligent operation of a military vehicle on a public road, which "calls only for 'traditional judicial analysis and findings'") (quoting *United States v. Megahey*, 553 F.Supp. 1180, 1198 (E.D.N.Y.1982)); *In re Agent Orange*, 373 F.Supp.2d at 70 (hold-

ing that the use of Agent Orange during the Vietnam War could "be characterized as 'an ordinary tort suit, alleging that the defendants breached a duty of care to plaintiffs or their decedents' ") (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir.1991)). These types of cases are not the sort that the judiciary readily views as "off-limits."

The fact that private contractors are not automatically insulated from liability under the political question doctrine—even when operating in a combat zone—was highlighted in the recent, well-reasoned case of *Smith v. Halliburton Co. (Smith I)*, No. H–06–0462, 2006 WL 1342823 (S.D.Tex. May 16, 2006). In *Smith I*, the court considered allegations of negligent security brought by the family of a United States civilian against a private contractor. *Id.* at *1 n. 4, 3–4. The contractor, operating the dining facility in Mosul, Iraq, was sued after a suicide bomber entered the facility, killing twenty-two and injuring sixty-two others. *Id.* at *1. The *Smith* court declined to dismiss the case based on the political question doctrine pending development of a factual record demonstrating who was responsible for securing the dining facility—the military or the defense contractor. *Id.* at *4.[5] The proper inquiry,

according to the court, was whether the claim would require the court to question the military's mission and response to an attack. If the military was responsible for securing the facility, resolving the matter would require "second-guessing military decision-making" and evaluating the conduct of the military—a political question. *Id.* However, if the contractor was primarily responsible for securing the dining hall under its contract, the suit would be justiciable. *Id.* Concluding that "[t]here is a basic difference between questioning the military's execution of a mission and questioning the manner in which a contractor carries out its contractual duties," *id.* at *3, the court foreshadowed the conclusion drawn here: the former situation presents a political question, while the latter does not.[6] *See also Ibrahim v. Titan Corp.*, 391 F.Supp.2d 10, 15 (D.D.C.2005) ("An action for damages arising from the acts of private contractors . . . does not involve the courts in 'overseeing the conduct of foreign policy or the use and disposition of military power.' ") (quoting *Luftig v. McNamara*, 373 F.2d 664, 666 (D.C.Cir.1967)).

This is not to suggest that all conduct performed by private contractors falls within the realm of ordinary tort law.

**5.** *See also Ibrahim v. Titan Corp.*, 391 F.Supp.2d 10, 15–16 (D.D.C.2005) (declining to hold, based on the facts available at a motion to dismiss, that claims against private defense contractors for the intentional torts committed at Abu Ghraib prison were nonjusticiable).

**6.** Following further discovery in *Smith*, the case was dismissed as a nonjusticiable political question. *Smith II*, 2006 WL 2521326, at *6–7, 2006 U.S. Dist. LEXIS 61980, at *26. Defendants noticed this Court of the recent *Smith* development, (Doc. 110), and emphasized that resolving *Smith* would require the court "to substitute its judgment on military decision-making for that of the branches of government entrusted with this task." (*Id.* at 2) (quoting *Smith I*, 2006 WL 1342823, at

*23). Despite the dismissal, the recent *Smith II* opinion only strengthens the position this Court takes today. The evidence in *Smith II* revealed that the defense contractor played no role in securing the facility but was responsible only for the provision of food services. *Smith II*, 2006 WL 2521326, at *3, 2006 U.S. Dist. LEXIS 61980, at *12. The contractors had no authorization to carry government-issued firearms, and the Army maintained sole responsibility for providing security. *Id.* at *3, 2006 U.S. Dist. LEXIS 61980, at *13–14. If the private defendants had been contractually obligated to provide force protection, and that duty was negligently carried out, then the political question doctrine would not have precluded the court from hearing the merits of the case.

Some contractor activity, heavily regulated and controlled by the military, may require a court to substitute its judgment for that of the Executive just as if the conduct were performed directly by service members pursuant to military order. *See Whitaker*, 444 F.Supp.2d at 1282 (concluding that the military's control over the contractor's convoy operation included "constraints other than ordinary skill, judgment, and prudence"). However, when a contractor operates contractually according to civilian standards and when the pressure of direct combat is absent, it is more likely that ordinary standards of care apply and the political question doctrine is not implicated.

The key inquiry is whether a court will have to question the wisdom of military operations and decision-making, or whether the court need only consider the private contractor's performance under the contract. Based on the allegations and current pleadings, the Court cannot conclude that the transportation of the decedents involved any military strategy or state secrets implicating national security. Plaintiffs allege that Defendants were transporting soldiers by civilian aircraft from one airbase to another, in clear weather, when the tragedy occurred. (Am. Compl. at 4, ¶¶ 17, 19.) Based on the current allegations, analysis of the operation of the flight pursuant to Defendants' contractual obligations will likely be necessary, but it is far from clear that it will be necessary to examine any military decision-making or unique government specifications. According to the Complaint, Defendants were instructed to operate their aircraft in compliance with Federal Aviation Regulation 135 and 32 CFR 861. (Am. Compl. at 3, ¶ 13.) They were responsible for "develop[ing] and implement[ing] a *commercial* quality control plan to ensure safe and reliable air transportation." (SOW ¶ 4.4) (emphasis added.) In the event the Defendants were required

to carry cargo and passengers, they were to receive FAA approval and comply with FAA guidelines regarding cargo placement. (*Id.* ¶¶ 1.8.2 & 1.8.3.) Defendants were required to fly as they normally would, according to commercial, civilian standards, in a foreign, albeit treacherous, terrain. Indeed, pursuant to the contract, the civilian personnel were entitled to refuse any mission that could not be completed safely. (*Id.* ¶ 1.1.5.) Thus, it does not appear, based on the allegations, that this Court will be called on to question any tactical military orders.

Ramifications may flow from allowing United States service personnel to sue private military contractors who operate on or near the battlefield, especially considering the extent to which our military forces now utilize private contractors in this manner. *See generally* William Spyro Speros, Note, *Friend–of–a–Friendly Fire: A Future Tort Issue of Contractors on the Battlefield*, 35 Pub. Cont. L.J. 297 (2006) (documenting the rapid rise in civilian contractors during the current conflict in the Middle East). The extent to which for-profit corporations, performing traditional military functions, are entitled to protection from tort liability is an area of interest to the political branches. However, under the current state of the law, the political question doctrine is not a proper basis for dismissing this case when the allegations appear to only implicate negligence principles and not military tactics. Thus, dismissal is not warranted under the political question doctrine.

**B. The** Feres *Doctrine and Intra–Military Immunity*

The *Feres* doctrine provides that the United States Government is immune from suit by service members for injury incurred as a result of their service

to the military.[7] *United States v. Johnson*, 481 U.S. 681, 681, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987). *Feres* establishes that the Federal Tort Claims Act ("FTCA"), which waives the Government's sovereign immunity and assumes liability "to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, does not waive sovereign immunity for "injuries to servicemen where the injuries arise out of or are in the course of activity incident to service," *Feres*, 340 U.S. at 146, 71 S.Ct. 153. Defendants contend that as "military contractors operating in a combat zone," (Defs.' Mem. at 1), they should share in the Government's sovereign immunity because "the reality of modern warfare" is that contractors perform traditional military functions. *Id.* at 2 (characterizing their role as part of the "Total Force").

### 1. Feres *Does Not Shield the Tortious Conduct of Private Parties*

 Defendants cite no case in which the *Feres* doctrine has been held applicable to private contractors.[8] *See e.g., Chapman v. Westinghouse Elec. Corp.*, 911 F.2d 267, 271 (9th Cir.1990) ("[T]he *Feres* doctrine, which applies only to suits against the government and its employees, poses no obstacle to [plaintiff's] suit [against a private defense contractor]."); *Durant v. Neneman*, 884 F.2d 1350, 1351 (10th Cir. 1989) ("The immunity established in *Feres* attaches only when an action has been brought against the government under the Federal Tort Claims Act."). Defendants' invocation of *Feres* is "misplaced." *See Ammend v. Bioport, Inc.*, 322 F.Supp.2d 848, 877 (W.D.Mich.2004). Not only are Defendants not entitled to *Feres* immunity, but the Supreme Court has plainly contemplated suit by soldiers against private contractors for service-related injuries. *United States v. Stanley*, 483 U.S. 669, 703, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) ("The judiciary is already involved, however, in cases that implicate military judgments and decisions, as when a soldier sues … civilian contractors with the Government for service-connected injury …."); *Johnson*, 481 U.S. at 700, 107 S.Ct. 2063 (5–4 decision) (Scalia, J., dissenting) ("[I]f a solder suffers service-connected injury because of the negligence of a civilian … he can sue that civilian …. ").

 Defendants essentially mask their request for this Court to stretch *Feres* beyond its established and logical bounds

7. Precluding suit by service members against the Government in this limited context is based on three rationales: (1) the distinctively federal relationship between the Government and members of its armed forces; (2) the compensation scheme of the Veterans' Benefits Act acts as a substitute for tort liability; and (3) " 'the peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of the suit on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty.' " *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 671–72, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977) (quoting *United States v. Brown*, 348 U.S. 110, 112, 75 S.Ct. 141, 99 L.Ed. 139 (1954)). *But see United States v. Johnson*, 481 U.S. 681, 703, 107 S.Ct. 2063, 95 L.Ed.2d 648

(1987) (Scalia, J., dissenting) (arguing in 5–4 decision that *Feres* 's rationales have been undermined and suggesting that *Feres* should be overruled, not extended).

8. Perhaps because Defendants seek such a broad extension of the *Feres* doctrine, Defendants rely on cases applying legal principles unrelated to the *Feres* doctrine, including the government contractor defense, official immunity, the political question doctrine, and derivative immunity under the Foreign Sovereign Immunities Act, to support their position that private defense contractors are the equivalent of the Federal Government. Though the rationales for each of these doctrines may overlap to some extent, they do not provide a proper basis for extending *Feres* to immunize the actions of private defense contractors such as Defendants.

by citing cases which emphasize that it is the plaintiff's status as a member of the military and not the status of the tortfeasor that is significant under *Feres*. *See Johnson*, 481 U.S. at 686, 689, 107 S.Ct. 2063; *Uptegrove v. United States*, 600 F.2d 1248, 1249 (9th Cir.1979). While a plaintiff's status as a member of the military is essential to the application of *Feres*—in that it only applies to claims "incident to service"—the doctrine is nonetheless only applicable when it is the United States's liability on the line, not when a private party has been sued. *Feres* requires two factors: the plaintiff must be a member of the military *and* the named defendant must be the United States Government or its civilian employees. To the extent that Defendants suggest that the Plaintiffs' status as survivors of servicemen ends the analysis and invokes *Feres*, Defendants miss the mark.

 Although *Feres*'s protection may properly be extended to civilian employees of the Government under the doctrine of sovereign immunity, it is unavailable to a private contractor. *See Johnson*, 481 U.S. at 686, 687 n. 8, 107 S.Ct. 2063 (applying *Feres* to shield the United States from liability for the torts of civilian government employees of the FAA); *Uptegrove*, 600 F.2d at 1249–51 (same); *see also Chapman*, 911 F.2d at 271 (rejecting *Feres* as a defense by defendant contractor in suit brought by naval member); *Stauber v. Cline*, 837 F.2d 395, 400 (9th Cir.1988). A private contractor that operates with "private profit objectives in operating under [a] contract" is "an entity distinct from the government," *Chapman*, 911 F.2d at 271, though the two are contractually linked.

Thus, success of Defendants' attempted invocation of *Feres* depends on whether they may properly be classified as government employees[9] or whether they are instead private, commercial, detached entities. *See id.* Clearly, Defendants in this case are not entitled to protection under the *Feres* doctrine because they are private commercial entities. According to the Statement of Work relating to Defendants' duties under the contract, the "[p]ersonnel performing this contract are considered to be *U.S. civilians* serving with, employed by, or accompanying the Armed Forces of the United States and coalition forces." (SOW ¶ 1.3) (emphasis added.) Though that description includes the possibility that certain contractors may be deemed employees of the Armed Forces, other factors suggest that these Defendants are merely civilians accompanying the Armed Forces. In a law review article cited by Defendants, contractor personnel who are "civilian members of military aircraft crews" are listed as "examples of contractors who qualify as 'persons accompanying the armed forces without actually being members thereof.'" Major Lisa Turner & Major Lynn G. Norton, *Civilians at the Tip of the Spear*, 51 A.F.L.Rev. 1, 9 (2001) (citing Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, art. 4A(4), 6 U.S.T. 331675 U.N.T.S. 135 (entered into force Oct. 21, 1950)) (hereinafter Geneva III). The Geneva Convention states that civilian members of military aircraft crews are not members of the armed forces if captured as prisoners of war. Geneva III.

Consistent with Geneva III, the Statement of Work provides for Defendants'

---

9. In another context, courts have determined that private contractors are not government employees. As the *Chapman* court noted, the Supreme Court has held that private contractors "are not government employees or instrumentalities" for the purpose of receiving state tax immunity. *Chapman*, 911 F.2d at 271; *see also Gasche v. United States*, No. 71–1451, 1973 WL 522 (N.D.Cal.1973); *Reynolds v. Comm'r of Internal Revenue*, T.C. Memo. 1972–84 (T.C.1972).

personnel to carry identity cards as "civilian noncombatant personnel authorized to accompany military forces of the U.S. into regions of war." (SOW ¶ 4.5.2.) Those personnel authorized to carry the cards were "employed by the contractor for performance of this contract," (id. ¶ 4.5.3); they were not employed by the Government. Defendants entered into the contract as a commercial endeavor. They provided a service for a price. Simply because the service was provided in the mountains of Afghanistan during armed conflict does not render Defendants, or their personnel, members of the military or employees of the Government. Indeed, although the Government made the initial decision to enter into the contract with Defendants, it appears, from the Contract and Statement of Work, that the Government had no oversight over Defendants' hiring of personnel.

Plaintiffs allege that Defendants acted as common carriers, required to abide by civilian aircraft regulations (Am. Compl. at 3, 4, 5), and that Defendants were distinct from the Government and the military. The contract confirms this conclusion. Perhaps the most telling provision is paragraph 1.1.5, wherein the "contractor may refuse any mission for safety reasons." (SOW ¶ 1.1.5.) Thus, whereas intra-governmental immunity, and even the government contractor defense, discussed below, is often justified in part by the Government's need to forgo certain safety concerns and take risks in sensitive military engagements, *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir.1989) (citing *Tozer v. LTV Corp.*, 792 F.2d 403, 406 (4th Cir.1986)), Defendants were expressly allowed to postpone or refuse any flight under the contract in the event that its performance was unsafe. As private defense contractors who are not government employees, Defendants are not entitled to protection under the *Feres* doctrine.

## 2. The Feres Doctrine was Expressly Rejected as the Basis for a Defense by Private Contractors

Moreover, the Supreme Court considered and rejected the *Feres* doctrine as a basis for a government contractor defense. In *Boyle v. United Technologies Corp.*, the Supreme Court recognized a government contractor defense insulating contractors from state tort liability for design defects in military equipment when the Government commands certain design specifications. 487 U.S. 500, 511, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). In doing so, the Court expressly rejected *Feres* as a source of the defense because it would be "in some respects too broad and in some respects too narrow." *Id.* at 510, 108 S.Ct. 2510. *Feres* would block all suits against manufacturers even when the equipment was not uniquely designed for the Government, and thus would be too broad in its reach. *Id.* It would also, however, be too narrow in that it would not prevent suits by civilians against manufacturers following the Government's specifications because *Feres* is specifically directed to military-plaintiff claims. *Id.* at 510–11, 108 S.Ct. 2510.

Defendants acknowledge *Boyle*'s rejection of the *Feres* doctrine, but they contend that the Supreme Court's concerns are inapplicable here "because of the different class of contractor and different context in which the claims arose." (Defs.' Mem. at 9) They also point out that since *Boyle* was decided, the military now relies heavily on the use of defense contractors during combat. *Id.* Defendants contend that the intra-military immunity doctrine should shield them because they perform traditional military functions in a combat zone. *Id.* Ultimately, Defendants argue that if a tort suit were to proceed against them, such potential tort liability would

undermine the military's interests and effectiveness. *Id.*

Despite Defendants' protestations to the contrary, the concerns expressed by the *Boyle* Court regarding the overbreadth and overnarrowness of basing a contractor defense on *Feres* are equally applicable here. State law tort suits by service members against contractors for injuries incident to service have been permitted to go forward by numerous courts in other contexts. *See, e.g., Boyle,* 487 U.S. at 509, 108 S.Ct. 2510 (hypothesizing as to types of claims in which a contractor would be liable); *Butler v. Ingalls Shipbuilding, Inc.,* 89 F.3d 582, 586 (9th Cir.1996) (permitting suit against contractor by navy service member for failure to warn); *Chapman,* 911 F.2d 267 (allowing suit by navy member against contractor operating government-owned facility). The mere fact that the accident occurred in Afghanistan will not immunize Defendants' allegedly tortious activity. To hold that the claims are barred because Plaintiffs' decedents were in the military would be contrary to case law allowing claims by servicemen against military providers in other contexts; in this respect it would be too broad. And, if non-military personnel had been killed or injured in this tragedy, Defendants most likely would still assert that any ensuing tort claims would be barred due to the nature of their activities, and *Feres* would be too narrow in scope.

In conclusion, the United States is not a named party in this suit and *Feres* has never been applied to protect private parties from tort liability. *See Ammend,* 322 F.Supp.2d at 877. Defendants' request that this Court extend the sovereign immunity of the United States to cover for-profit corporations contracting with the United States is declined.

### C. Combatant Activities Exception to the FTCA

 Finally, Defendants argue that they are entitled to immunity under the "combatant activities" exception to the FTCA. The combatant activities exception provides that the Government does not waive its sovereign immunity from suits regarding "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). Although Defendants are not governmental entities, they assert that the combatant activities exception provides the basis for federal preemption of Plaintiffs' state law tort claims, *see Boyle,* 487 U.S. 500, 108 S.Ct. 2510, with the result that Plaintiffs' claims must be dismissed.

 Defendants' reliance on the combatant activities exception is loosely based on the Supreme Court's unique preemption analysis laid out in *Boyle,* 487 U.S. at 504–08, 108 S.Ct. 2510, in which the Court crafted the government contractor defense after the survivors of a Marine sued the defendant contractors for defectively designing his helicopter's escape system. *Id.* at 502–03, 108 S.Ct. 2510. The Court noted that the claim for "liability may be styled [as] one in tort, but it arises out of performance of the contract [between the contractors and the United States Government] ...." *Id.* at 505, 108 S.Ct. 2510. Concluding that state tort law was preempted by the government's profound interest in procuring complex military equipment, the Court endorsed the affirmative defense.[10] *Id.* at 504, 507, 108 S.Ct.

---

**10.** This affirmative defense protects the manufacturer from liability "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle,* 487 U.S. at 512, 108 S.Ct. 2510.

2510. The Court grounded the defense in the discretionary function exception[11] to the FTCA, reasoning that the Government has the discretion to prioritize combat effectiveness over safety when designing military equipment. *Id.* at 511, 108 S.Ct. 2510. Thus, an affirmative defense was made available to those private contractors in the very limited context of equipment procurement.

 Recognizing that the government contractor defense is limited to a small subset of product liability claims, Defendants do not expressly rely on it.[12] Instead, they argue entitlement to something far greater—"immunity" under the combatant activities exception based on the same sort of preemption applied in *Boyle.* The combatant activities exception preserves the Government's sovereign immunity from the FTCA's general waiver of immunity and shields the United States from suit arising from combatant activities. *See, e.g., Koohi,* 976 F.2d at 1333, 1335; *Goldstein v. U.S.,* 2003 WL 24108182, at *4; *In re Consol., United States Atmospheric Testing Litig.,* 616 F.Supp. 759, 779–80 (N.D.Cal.1985). *But see In re Agent Orange Prod. Liab. Litig.,* 580 F.Supp. 1242, 1255 (E.D.N.Y.1984) (noting that the exception would not prevent a civilian's suit based on her injury if a grenade exploded because of improper government specifications, but would preclude a civilian's suit for injury if a soldier was negligent in directing a grenade towards an enemy). This exception has been applied by two courts to preclude suits against private contractors that "aris[e] out of the combatant activities of the military ... during time of war," 28 U.S.C. § 2680(j). *See Koohi,* 976 F.2d 1328; *Bentzlin,* 833 F.Supp. 1486.

In concluding that the combatant activities exception barred the claim brought by "enemy" civilians against the private defense contractors, the Ninth Circuit, in *Koohi,* relied on an older decision, which suggested that the exception "would shield from liability those who supply ammunition to fighting vessels in a combat area." *Id.* at 1336–37 (citing *Johnson v. United States,* 170 F.2d 767, 770 (9th Cir.1948)). The court in *Johnson,* however, considered and rejected the combatant activities exception in a suit against the United States after one of its naval vessels was charged with polluting a clam farm. 170 F.2d at 770. The *Johnson* court did not suggest that the combatant activities exception would shield a private party for supplying ammunition, but rather that such activity, performed by the United States, would qualify as a combatant activity. *Id.* at 768, 770. Despite the distinction, *Koohi* held that "similar logic would seem to shield those who supply a vessel's weapons," and found that the combatant activities exception preempted the state tort law claims against the defense contractors. In doing so, however, the court emphasized that "[n]either the United States nor its defense contractors owed any duty to [enemy forces or "enemy" civilians]." *Koohi,* 976

**11.** This exception provides that the Government does not waive its sovereign immunity where the suit involves "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

**12.** Defendants articulated this defense as one of their "colorable federal defenses" in their motion to remand, but they do not expressly argue for *Boyle* 's preemption analysis in their motion to dismiss. However, Plaintiffs argue against the *Boyle* defense in their opposition memorandum. (Doc. 56 at 13–16.)

F.2d at 1337. For the first time, the combatant activities exception to the FTCA was extended to preempt tort law claims against defense contractors where plaintiffs were survivors of "enemy" civilians.

*Bentzlin* also applied the combatant activities exception to preempt tort law claims against defense contractors after six marines were killed by friendly fire. 833 F.Supp. at 1487. The survivor-plaintiffs alleged "that a manufacturing defect caused the missile to deviate from its intended target and strike the Marines." *Id.* The United States intervened and the contractors moved to dismiss, arguing, among other things, that "state law tort actions against government contractors that arise out of combat" are preempted by federal common law. *Id.* The court agreed and dismissed the claims against the contractors, opining that "the 'government contractor defense' necessarily extends to suits ... which arise from wartime activity ('combat preemption')." *Id.* at 1489.

Whether the *Bentzlin* and *Koohi* courts unwittingly confused the government contractor defense and the combatant activities exception to the FTCA, or whether they crafted an entirely new defense based on sovereign immunity and federal preemption, this Court declines to endorse such a defense for private contractors based solely on the fact that Defendants were operating in a combat zone.[13] This Court can find no persuasive authority for the conclusion that the combatant activities exception preempts state tort law claims. The combatant activities exception to the FTCA is an explicit legislative preservation of sovereign immunity, while the government contractor defense is a judicially recognized affirmative defense, grounded in federal preemption and the discretionary function exception to the FTCA. The latter defense shields contractors only in military equipment procurement contracts and only when the government dictates design specifications. Private contractors are not entitled to sovereign immunity unless they are characterized as government employees, which Defendants are not. *Foster v. Day & Zimmermann, Inc.,* 502 F.2d 867, 874 (8th Cir.1974) ("The doctrine of sovereign immunity may not be extended to cover the fault of a private corporation, no matter how intimate its connection with the government."). There is no express authority for judicially intermixing the government contractor defense and the combatant activities exception; nor is there authority for bestowing a private actor with the shield of sovereign immunity. Until Congress directs otherwise, private, non-employee contractors are limited to the government contractor defense and *Boyle*'s preemption analysis. Unless they qualify as employees or agents of the Government, private contractors may not bootstrap the Government's sovereign immunity.

Even if the courts in *Koohi* and *Bentzlin* did not err in extending the combatant activities exception to private defense contractors, the exception has, nonetheless, been limited to products liability claims when applied to private actors, just as the government contractor defense has. *Smith I,* 2006 WL 1342823, at *5 (noting that the combat activities exception has not been extended to cover negligent failure to secure); *Fisher v. Halliburton (Fisher I),* 390 F.Supp.2d 610, 615–16

---

**13.** *See also Carmichael,* 450 F.Supp.2d at 1377 n. 3, 1378–79 (criticizing and declining to follow *Koohi*'s expansion of *Boyle,* which was "not a grant of immunity to contractors"); *Lessin,* U.S. Dist. LEXIS 39403, at

*10–15 (distinguishing *Koohi* and *Bentzlin* based on the military's role in the incidents involved in those cases and declining to extend the combatant activities exception to defendant contractors charged with negligence).

(S.D.Tex.2005) ("Defendants herein have cited no case in which the § 2680(j) 'combatant activities' exception or any other exception to the FTCA's waiver of sovereign immunity has been held to bar ... claims against a defense contractor other than in situations in which the contractor has provided allegedly defective products ...."); *see also Bentzlin*, 833 F.Supp. at 1492–95 (applying the exception to a manufacturer's design of a Maverick missile); *Koohi*, 976 F.2d at 1336–37 (applying the exception to a manufacturer's design of an Aegis Air Defense System). Thus, even if private contractors may rightly seek haven under the combatant activities exception, dismissals of such claims have only involved alleged defects in complex military machinery. This Court, like the *Smith* and *Fisher* courts, has found no case extending the combatant activities exception to private contractors for negligent provision of services.

In sum, this Court is skeptical that the combatant activities exception to the FTCA, which preserves the Government's traditional sovereign immunity from liability, has any application to suits against private defense contractors. To the extent that it does apply, however, at most it only shields private defense contractors for products liability claims involving complex, sophisticated equipment used during times of war. It has never been extended to bar suits alleging active negligence by contractors in the provision of services, and it shall not be so extended by this Court.

## III. CONCLUSION

In their motion to dismiss, Defendants argue that this suit is nonjusticiable, that it is barred by intra-military immunity, and that it falls under the combatant activities exception to the FTCA. All three arguments fail. First, the political question doctrine does not apply because the suit does not necessarily require this Court to second-guess military decision-making or strategy. Neither the decedents' status as service members nor Defendants' status as military contractors renders this cause of action nonjusticiable. Second, the *Feres* doctrine, which bars suits against the Federal Government, is not applicable to this suit against private defendants. Furthermore, there is no basis for expanding the *Feres* doctrine to allow private parties to share in the Government's sovereign immunity. Finally, the combatant activities exception to the FTCA, preserving the Government's sovereign immunity, is also inapplicable to private defendants. To the extent that some courts have applied the combatant activities exception to private defendants, that exception, like the government contractor defense, has been limited to products liability actions and thus has no bearing on this case.

The defenses raised by Defendants all rely on the belief that their exposure to liability while performing services in Afghanistan pursuant to a contract with the United States is contrary to the interests of the Government. The Government, however, has not weighed in on this issue. It has declined an opportunity to intervene and explain how its interests might be affected by this lawsuit, and Defendants have not identified any action taken by the political branches that would support this supposition. Having no cognizable defense, Defendants have suggested that one be judicially created for them simply because they have entered into a contract with the Government to perform duties traditionally performed by the uniformed military services in a region of the world where the United States is engaged in combat. While there may be valid reasons for protecting private corporations assisting the United States in carrying out military operations, that question is better addressed by the political branches.

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion to Dismiss (Doc. 40) is **DENIED.**

2. Defendants' Appeal of the Order Denying Defendants' Motion for Protective Order to Stay Further Discovery Pending Disposition of Defendants' Motion to Dismiss (Docs.69/71) is **DENIED.**

3. Defendants' Appeal of the Order Granting in Part and Denying in Part Without Prejudice Plaintiffs' Motion to Compel Discovery (Docs.69/71) is **DENIED.**

4. Defendants' Motion for Stay Pending Disposition of Motion to Dismiss (Doc. 69) is **DENIED.**

5. The Case Management and Scheduling Order (Doc. 26) is hereby **VACATED.** The parties are ordered to submit a new case management report by October 13, 2006.

6. The Stay on Discovery (Doc. 85) is **VACATED.**

7. Defendants' Emergency Appeal of their Motion to Quash (Docs.82/83) is **DENIED.**

8. Plaintiffs' Motion to File Supplemental Exhibits in Opposition to Motion to Dismiss (Doc. 105) is **DENIED.**